## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JESSICA MARTINEZ, on behalf of herself and her minor son JOSE MARTINEZ, DAHLIA BRYAN, on behalf of herself and her minor children JORR MOORLEY, CURTIS MOORLEY, ALEC PATTERSON, and JAIDYN BRYAN, LESLIE RODRIGUEZ, on behalf of herself and her minor granddaughter NINA MARTINEZ, and FRANKIE FRANCES, on behalf of himself and his minor son, DYLON FRANCES, | |
| Plaintiffs, | |
| v. | Civil Action No. _____ |
| DANNEL PATRICK MALLOY, in his official capacity as Governor of Connecticut, DIANNA WENTZELL, in her official capacity as Commissioner of Education, KEVIN LEMBO, in his official capacity as State Comptroller, DENISE NAPPIER, in her official capacity as State Treasurer, and DENISE W. MERRILL, in her official capacity as Secretary of State, | |
| Defendants. | |

## COMPLAINT

Plaintiffs JESSICA MARTINEZ, on behalf of herself and her minor son JOSE MARTINEZ, DAHLIA BRYAN, on behalf of herself and her minor children JORR MOORLEY, CURTIS MOORLEY, ALEC PATTERSON, and JAIDYN BRYAN, LESLIE RODRIGUEZ, on behalf of herself and her minor granddaughter NINA MARTINEZ, and FRANKIE FRANCES, on behalf of himself and his minor son, DYLON FRANCES (collectively, "Plaintiffs") complain of Defendants (collectively, "the State" or "Connecticut") and allege:

## INTRODUCTION

1.      More than 60 years ago, the United States Supreme Court proclaimed that the "opportunity of an education, . . . where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). As the Supreme Court explained, education—the "very foundation of good citizenship"—is "required in the performance of our most basic public responsibilities, even service in the armed forces." *Id.* It is also "a principal instrument in awakening" children "to cultural values," in "preparing [them] for later professional training," and in "helping [them] to adjust normally to [their] environment[s]." *Id.* Indeed, "it is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education." *Id.* In short, "education is perhaps the most important function of state and local governments." *Id.*

2.      Since *Brown*, state and federal governments have assumed an even more prominent role in regulating and shaping the educational experience for students. Most states have recognized a fundamental right to education under their state constitutions, and many states have shifted educational funding and management from school district localities to the state. The federal government has become increasingly entwined in education in the last half-century as

well, through funding and educational policy legislation such as Title I, the No Child Left Behind Act, and Race to the Top. *See* Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. ch. 70); No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1425; American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 14006, 123 Stat. 115, 283-84; Race to the Top Fund, 74 Fed. Reg. 59,688 (Nov. 18, 2009). Now, more than ever, public education represents "'a most fundamental obligation of government to its constituency.'" *Ambach v. Norwick*, 441 U.S. 68, 76-78 (1979) (quoting *Foley v. Connelie*, 435 U.S. 291, 297 (1978)).

3.     For thousands of poor and minority students in cities like Bridgeport, Hartford, and New Haven, however, Connecticut is failing to "fulfill[] [this] most fundamental obligation." *Ambach*, 441 U.S. at 76-78. These inner-city children are compelled to attend public schools that the State knows have been failing its students for decades—consistently failing to provide even a minimally adequate education. Yet, at the same time, Connecticut has taken steps that prevent these poor and minority children from having viable public-school alternatives—knowingly depriving low-income and minority schoolchildren of the vital educational opportunities available to their more affluent and predominantly white peers. This intolerable, "state-imposed" system of discrimination "disrespect[s] and subordinate[s]" the liberty and dignity of children living in Connecticut's most neglected communities, relegating them to second-class citizenship and stamping them with a badge of inferiority that will harm them "for the rest of time." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594-95, 2604 (2015).

4.     The inexcusable educational inequity and inadequacy in Connecticut is, in substantial part, the result of state laws and policies that prevent inner-city students from accessing even minimally acceptable public-school options:

      i.   <u>First</u>, Connecticut has instituted a moratorium on new magnet schools (Conn. Gen. Stat. § 10-264*l*(b)(1); Public Act No. 09-6, § 22 (Spec. Sess.); Public Act No. 15-177, § 1), despite the fact that a large majority of Connecticut's magnet schools consistently outperform inner-city traditional district schools.

      ii.   <u>Second</u>, Connecticut's arcane and dysfunctional laws governing public charter schools (Conn. Gen. Stat. §§ 10-66ee(c)-(d), 10-66bb(a), 10-66bb(g)) prevent high-performing charter schools from opening or expanding in the State, despite the fact that Connecticut's few charter schools consistently outperform inner-city traditional district schools.

      iii.   <u>Third</u>, Connecticut's inter-district Open Choice enrollment program (Conn. Gen. Stat. §§ 10-266aa(c), 10-266aa(e), 10-266aa(f), 10-266aa(g), 10-266aa(h)) penalizes school districts that accept students from inner-city school districts, thus dooming the viability of the very program ostensibly designed to provide Connecticut's students with quality public-school options.

5.     These State laws and official policies (collectively, the "Anti-Opportunity Laws") limit the educational opportunities available to Connecticut's students, forcing thousands of poor and minority students to attend traditional district schools that the State knows are consistently failing to provide students with a minimally acceptable education, leaving them languishing on waitlists for years and years, and "impos[ing] a lifetime hardship" on Connecticut's most vulnerable young citizens. *Plyler v. Doe*, 457 U.S. 202, 223 (1982).

6.     As a direct result of these Anti-Opportunity Laws, low-income and minority children in Connecticut's poorest communities are resigned to a devastating game of chance that effectively determines their odds of success in life, based on nothing more than the ZIP codes in which their parents reside.  They are forced to shoulder the crippling burden of an inferior and

inadequate education—an unwarranted penalty that substantially undermines the most fundamental precepts of liberty and equality. And, as a direct result of the Anti-Opportunity Laws, they will fall further and further behind their peers, with little or no chance of ever breaking free from the State-sanctioned chains that bind them.

7. Connecticut has no possible justification for intentionally subjecting poor and minority children to such unequal and unfair treatment. Where—as here—the State knows that it is not providing, and cannot provide, substantially equal educational opportunities to inner-city children, then it must not stand in the way of feasible options that would significantly improve the quality of their lives.

8. For far too many low-income and minority students in Connecticut, the Anti-Opportunity Laws have reduced *Brown*'s promise of equality and liberty to nothing more than a cruel fiction. Indeed, the Anti-Opportunity Laws routinely deny thousands of Connecticut students of the opportunity for equal participation in education and, as a result, of an equal opportunity to thrive and succeed in society. Through these pernicious laws and policies, Connecticut knowingly and without any rational justification "heavily burden[s]," *Bullock v. Carter*, 405 U.S. 134, 144 (1972), and "substantial[ly] . . . dilute[s]," *Reynolds v. Sims*, 377 U.S. 533, 568 (1964), the fundamental due process and equal protection rights of Connecticut students, in violation of the Fourteenth Amendment to the United States Constitution.

9. Plaintiffs ask this Court for a simple declaration that would have immeasurable benefits for many thousands of children: By forcing Plaintiffs and thousands of other students to attend public schools that it *knows* are failing, while impeding the availability of viable public educational alternatives through the Anti-Opportunity Laws, Connecticut is violating students' federal due process and equal protection rights. Connecticut should be required to take any and

all steps necessary to ensure that neither Plaintiffs nor any other students within its borders are forced to attend a failing public school.

**PARTIES**

**A.     The Plaintiffs**

10.     Plaintiff JESSICA MARTINEZ is a single Hispanic mother who resides in Bridgeport, Connecticut.  Jessica Martinez has repeatedly applied on behalf of her son for admission to high-performing magnet schools, but—as a direct result of the Anti-Opportunity Laws—he has been denied admission to those schools based on a lack of capacity.

11.     Plaintiff JOSE MARTINEZ, Jessica Martinez's thirteen-year-old Hispanic son, resides with Jessica in Bridgeport, Connecticut, attends an under-performing traditional district school in the Bridgeport School District called John Winthrop School, and is zoned to attend Harding High School for the 2017-18 school year, one of the lowest-performing high schools in the State.  Jessica has repeatedly applied on Jose's behalf for admission to higher-performing magnet schools, but—as a direct result of the Anti-Opportunity Laws—Jose has been denied admission each and every time.  Although Jessica intends to apply on Jose's behalf for admission to higher-performing magnet and charter high schools and/or to apply for an inter-district transfer to higher-performing traditional district schools in the future, the Anti-Opportunity Laws are likely to prevent Jose from gaining admission to any such schools.

12.     Plaintiff DAHLIA BRYAN is a single Caribbean-American mother who resides in Hartford, Connecticut.  She has five children, including a five-year old son named Jaidyn Bryan, an eight-year old daughter named Jorr Moorley, a ten-year old son named Curtis Moorley, and a thirteen-year old son named Alec Patterson.  Dahlia Bryan has repeatedly applied on behalf of her children for admission to high-performing magnet and charter schools, but—as a

6

direct result of the Anti-Opportunity Laws—every child except Curtis has been denied admission to those schools based on a lack of capacity.

13.     Plaintiff JORR MOORLEY, Dahlia Bryan's eight-year-old daughter, resides with Dahlia in Hartford, Connecticut, and attends Sarah H. Rawson Elementary, a low-performing traditional district school in the Hartford School District.  Dahlia has repeatedly applied on Jorr's behalf for admission to higher-performing magnet and charter schools, but—as a direct result of the Anti-Opportunity Laws—Jorr has been denied admission each and every time.  Although Dahlia intends to apply on Jorr's behalf for admission to higher-performing magnet or charter schools and/or to apply for an inter-district transfer to higher-performing traditional district schools in the future, the Anti-Opportunity Laws are likely to prevent Jorr from gaining admission to any such schools.

14.     Plaintiff CURTIS MOORLEY, Dahlia Bryan's ten-year-old son, also resides with Dahlia in Hartford, Connecticut.   Curtis was recently accepted into and plans to attend Achievement First Hartford Academy, a high-performing public charter school.  The Anti-Opportunity Laws make it far more likely that Achievement First Hartford Academy will be unable to obtain funding for the upcoming school year and/or future school years.  If and when that occurs, it is likely that Curtis will have no choice but to attend a low-performing traditional district school in his neighborhood.

15.     Plaintiff ALEC PATTERSON, Dahlia Bryan's thirteen-year-old son, also resides with Dahlia in Hartford, Connecticut.   Alec attends Sarah H. Rawson Elementary, a low-performing traditional district school in the Hartford School District.  Dahlia has repeatedly applied on Alec's behalf for admission to higher-performing magnet and charter schools, but—as a direct result of the Anti-Opportunity Laws—Alec has been denied admission each and every

time.  Although Dahlia intends to apply on Alec's behalf for admission to higher-performing magnet or charter schools and/or to apply for an inter-district transfer to higher-performing traditional district schools in the future, the Anti-Opportunity Laws are likely to prevent Alec from gaining admission to any such schools.

16.     Plaintiff JAIDYN BRYAN, Dahlia's five-year-old son, also resides with Dahlia in Hartford, Connecticut.    Jaidyn attends Sarah H. Rawson Elementary, a low-performing traditional district school in the Hartford School District.  Dahlia has repeatedly applied on Jaidyn's behalf for admission to higher-performing magnet and charter schools, but—as a direct result of the Anti-Opportunity Laws—Jaidyn has been denied admission each and every time. Although Dahlia intends to apply on Jaidyn's behalf for admission to higher-performing magnet or charter schools and/or to apply for an inter-district transfer to higher-performing traditional district schools in the future, the Anti-Opportunity Laws are likely to prevent Jaidyn from gaining admission to any such schools.

17.     Plaintiff LESLIE RODRIGUEZ is a single Hispanic mother and grandmother who resides in Bridgeport, Connecticut.  Leslie Rodriguez takes care of both her special-needs daughter and her granddaughter, Nina Martinez.  Leslie Rodriguez has repeatedly applied on behalf of her granddaughter for admission to higher-performing magnet and charter schools, but—as a direct result of the Anti-Opportunity Laws—Nina has been denied admission to those schools based on a lack of capacity.

18.     Plaintiff NINA MARTINEZ, Leslie Rodriguez's eight-year-old granddaughter, resides with Leslie in Bridgeport, Connecticut.  Nina attends the Hall School, a low-performing traditional district school in the Bridgeport School District.  Leslie has repeatedly applied on Nina's behalf for admission to higher-performing magnet and charter schools, but—as a direct

result of the Anti-Opportunity Laws—Nina has been denied admission each and every time. Although Leslie intends to apply on Nina's behalf for admission to higher-performing magnet or charter schools and/or to apply for an inter-district transfer to higher-performing traditional district schools in the future, the Anti-Opportunity Laws are likely to prevent Nina from gaining admission to any such schools.

19.    Plaintiff FRANKIE FRANCES is a single African-American father who resides in Bridgeport, Connecticut.  Frankie has repeatedly applied on his son's behalf for admission to high-performing magnet and charter schools, but—as a direct result of the Anti-Opportunity Laws—he has been denied admission to those schools based on a lack of capacity.

20.    DYLON FRANCES, Frankie Frances's nine-year-old son, resides with Frankie in Bridgeport, Connecticut.  Dylon attends Cesar A. Batalla School, a low-performing traditional district school in the Bridgeport School District.  Frankie has repeatedly applied on Dylon's behalf for admission to higher-performing magnet and charter schools, but—as a direct result of the Anti-Opportunity Laws—Dylon has been denied admission each and every time based on a lack of capacity.  Although Frankie intends to apply on Dylon's behalf for admission to higher-performing magnet or charter schools and/or to apply for an inter-district transfer to higher-performing traditional district schools in the future, the Anti-Opportunity Laws are likely to prevent Dylon from gaining admission to any such schools.

**B.    The Defendants**

21.    Defendant DANNEL PATRICK MALLOY serves as the Governor of the State of Connecticut.  In his official capacity, the Governor is the chief executive officer of the State of Connecticut.  It is the responsibility of the Governor to ensure that the laws of the State are properly enforced.  The Governor presides over Connecticut's executive functions, appoints the Commissioner of Education, and may line-item veto budgetary legislation.  *See* Conn. Const. art.

IV, § 5 ("The supreme executive power of the state shall be vested in the governor."); § 14 (providing that all commissions "shall be in the name and by authority of the state of Connecticut; shall be sealed with the state seal, signed by the governor, and attested to by the secretary of state"); § 16 (allowing the Governor to "disapprove of any item or items of any bill making appropriations of money embracing distinct items while at the same time approving the remainder of the bill, and the parts or part of the bill so approved shall become effective and the item or items of appropriations so disapproved shall not take effect unless" overridden by the General Assembly); Conn. Gen. Stat. §§ 10-1(b), 10-2(a), 10-3a; *Sheff v. O'Neill*, 678 A.2d 1267, 1271 n.4 (Conn. 1996) (naming Governor as defendant in facial challenge to Connecticut's education policies).

22.    Defendant DIANNA WENTZELL, in her official capacity as Commissioner of Education, is the director of the Connecticut State Department of Education, which, as the administrative arm of the Connecticut State Board of Education, is responsible for implementing and overseeing the educational interests of the State of Connecticut.  Conn. Gen. Stat. § 10-3a. Defendant WENTZELL has executive authority pertaining to the administration, coordination, and supervision of the activities of the Connecticut State Department of Education.  *Id.* Defendant WENTZELL also serves as the secretary to the Connecticut State Board of Education, which is responsible for supervising and controlling the educational interests of the State, including the State's interest in ensuring (1) that each child be provided an equal opportunity to receive a suitable program of educational experiences; (2) the reduction of racial, ethnic and economic isolation amongst students; and (3) the implementation of State statutory mandates pertaining to education.  Conn. Gen. Stat. §§ 10-2(a), 10-4, 10-4a.  No additional magnet schools may be opened unless and until Defendant WENTZELL, acting as Commissioner of Education,

assesses magnet schools' performance and develops a comprehensive statewide magnet school plan.  *See* Conn. Gen. Stat. § 10-264*l*(b)(1); Public Act No. 09-6, § 22 (Spec. Sess.); Public Act No. 15-177, § 1.

23.     Defendant KEVIN LEMBO, in his official capacity as State Comptroller of Connecticut, oversees the State's accounts, disbursements of public money, and prescribes the mode of keeping and rendering all public accounts of departments or agencies of the State and of institutes supported by the State or receiving State aid by appropriation from the General Assembly.  *See* Conn. Gen. Stat. § 3-112; Conn. Const. art. IV, § 24 (the Comptroller "adjust[s] and settle[s] all public accounts and demands, except grants and orders of the general assembly," "shall prescribe the mode of keeping and rendering all public accounts," and "shall, ex officio, be one of the auditors of the accounts of the treasurer").  Defendant LEMBO is responsible for paying any amounts of educational funding due to towns, upon certification of the Commissioner of Education (Defendant WENTZELL), under Connecticut's State funding formula and charter school disbursement schedule.  *See* Conn. Gen. Stat. § 10-262i(b)(1), (b)(2).

24.     Defendant DENISE NAPPIER, in her official capacity as State Treasurer, "receive[s] all monies belonging to the state, and disburse[s] the same only as [s]he may be directed by law."  Conn. Const. art. IV, § 22.  The State Treasurer may not pay any "warrant, or order for the disbursement of public money, until the same has been registered in the office of the comptroller."  *Id.*; *see also* Conn. Gen. Stat. § 3-11 et seq.  Defendant NAPPIER is responsible for "pay[ing] out the public moneys only upon the order of the General Assembly, of the Senate, of the House of Representatives, of the several courts when legally authorized or of the Comptroller for accounts legally adjusted by him or when he is authorized to order for the payment of money from the Treasury."  Conn. Gen. Stat. § 3-25(a).

25.     Defendant DENISE W. MERRILL, in her official capacity as Secretary of State, keeps all the public records and documents and records all acts, orders, grants and resolutions of the General Assembly, including all resolutions of appointment and resolutions directing orders to be drawn on the Treasurer.  Conn. Gen. Stat. § 3-77.  Defendant MERRILL is responsible for certifying to the Treasurer and the Comptroller the amount and purpose of each appropriation made by the General Assembly.  Conn. Gen. Stat. § 3-81.

## JURISDICTION AND VENUE

26.     This case raises questions under the Constitution of the United States and 42 U.S.C. § 1983.   Thus, this Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, based on information and belief, all Defendants are residents of this judicial district and, based on information and belief, all Defendants reside in the State of Connecticut.  Venue is also proper in this Court because a substantial part of the events giving rise to the claim occurred in this judicial district, which spans the entire State of Connecticut.

28.     An actual controversy currently exists between the parties concerning the constitutionality of Connecticut's magnet-school moratorium, charter-school authorization and funding process, and open-choice enrollment scheme.   That controversy is justiciable in character, and relief is necessary to and capable of preserving Plaintiffs' rights and preventing future harm to Plaintiffs.

<u>**FACTS**</u>

A.    **Connecticut Knowingly Deprives Its Students of Fundamental Liberty and Equality Interests Protected by the U.S. Constitution**

1.    **Connecticut Deliberately Compels Thousands of Students to Attend Chronically Failing Public Schools**

29.    Connecticut, like every other state in the union, maintains and enforces compulsory attendance laws requiring children between the ages of five and eighteen to attend school.  *See* Conn. Gen. Laws § 10-184 et seq.  Parents who fail to comply with this compulsory education law face fines of up to $25 for each day that their children do not attend school.  *See* Conn. Gen. Laws § 10-185.

30.    Despite the fact that Connecticut compels the children within its borders to attend school, thousands of students across the State are confined to severely underperforming public schools—schools that, as the State well knows, simply do not provide students with the necessary tools to succeed academically or to become productive and successful members of society.  Worse, the State has taken unreasonable and unnecessary steps that ensure some children have no choice but to receive an education that is substantially unequal and completely inadequate, even though the State knows that better alternatives are possible.

31.    Connecticut's very own statewide academic performance index confirms that the State is acutely aware of this sad reality.  Prior to 2016, Connecticut's State Department of Education ("SDE") computed "Performance Indices" for school districts, school sites, and individual students based on student performance on a collection of standardized statewide tests that are administered annually:  the Connecticut Mastery Test, the Connecticut Academic Performance Test, the Modified Assessment System, and the Skills Checklist.  The School Performance Index, or "SPI," ranges from zero to 100, with 100 being the best performance, and zero being the worst.  The target for schools is at least 88 on this scale, and the SDE expects that

schools will have an SPI of 88 or above.  The statewide average, however, was just 67—far below the State's benchmark.

32.    Starting in 2016, the State adopted a "Next Generation Accountability System" ("NGAS") that uses these performance indices along with several other indicators to determine an overall "accountability index" score for its schools.  The State also now uses new tests— called "Smarter Balanced Assessments" ("SBAs")—to assess academic performance based on "learning expectations for what students should know and be able to do at each grade level." The SBAs test English Language Arts/Literacy and Math, and have four "levels" of achievement:  Level 1, Level 2, Level 3, and Level 4.  Whereas "[s]tudents performing at Levels 3 and 4 are considered on track to demonstrating the knowledge and skills necessary for college and career readiness," students performing at Levels 1 and 2 are falling behind.  The State not only defines Level 1 and 2 students as below the "Achievement Level," but also knowingly recognizes that students in Level 2 "will likely need support to get on track for success" and that students in Level 1 "will likely need substantial support to get on track for success."

33.    The SDE deems those schools that are "among the lowest performing schools in Connecticut" as "Turnaround" schools, and it has labeled schools with "the lowest-performing student subgroups across the State" that "are contributing to academic achievement gaps and graduation rate gaps"—schools that are hovering just above the category of "Turnaround" schools in terms of academic performance—as "Focus" schools.  Together, these Focus and Turnaround schools are in the bottom 10% of schools in the State based on their students' academic outcomes.

34.    In 2012-2013, a shockingly high *38,967* students in Connecticut were trapped in chronically failing schools—schools with SPI scores of 50 or less.  Even worse, nearly 90% of

the children attending these chronically failing schools are children of color and children living in poverty, and nearly all of these schools are concentrated in five cities—Bridgeport, Hartford, New Britain, New Haven, and Waterbury.

35.     Roughly 30% of the students in Hartford School District, for example, are trapped in schools categorized by the State as a Turnaround or Focus school.  In the New Haven School District, the situation is no better—more than 31% of New Haven students are stuck in these failing schools.  Worst of all, nearly *half* of the students in Bridgeport School District are stuck in Turnaround or Focus schools.

36.     In these and other school districts, entire classrooms of students are being left behind, each and every day.  In one Connecticut grade school, for example, only 28 out of 286 children over a six-year period were able to read at or above grade level by the 3rd grade.  At another Connecticut grade school, over a four-year period, only one in fifteen 3rd grade students could read at or above grade level.  At one Connecticut high school, even though the school reported a graduation rate of 74.7% in 2007, less than 10% of students taking the 10th grade State exam scored at or above grade level in reading from 2007 to 2011.

37.     The Plaintiffs' experiences in Connecticut's education system illustrate and exemplify this pervasive chronic failure.  Each of the Plaintiffs has attended, currently attends, or will soon attend, an underperforming traditional district school.

38.     Plaintiff Jose Martinez, for example, previously attended a traditional district school in Bridgeport called the Luis Munoz Marin School, one of the lowest performing schools in the State.  In 2013, the Luis Munoz Marin School received an "F" on its School Report Card from the Connecticut Coalition for Achievement Now ("ConnCAN") because it had an abysmal

35.8 SPI—more than *52 points* below the state goal.[1]  For this reason, the SDE categorized Luis Munoz Marin School as a Turnaround school.  And in 2015-2016, just *5.3%* of students at Luis Munoz Marin were at Level 3 or above in English Language Arts/Literacy and only *1.8%* were at Level 3 or above in Math, in the new state-administered SBAs.

39.     Although Jose has since transferred out of Luis Munoz Marin School, he is zoned to attend Harding High School for high school, which also received an "F" on ConnCAN's Report Card, recently scored an overall SPI of 32.8 (including scores of 29.6 and 30.5 in math and reading), and is among the lowest-performing schools in the entire State.  Indeed, in the 2015-2016 school year, the vast majority of Harding students—77% and 68%, respectively— failed to meet the college-ready standard on the Scholastic Aptitude Test ("SAT") in math and English Language Arts.  One of Jose's teachers even once advised Jessica Martinez, Jose's mother, that she and Jose should "move to Fairfield County"—a wealthier, whiter suburb with higher quality traditional district schools—because "her son doesn't belong here" in one of Bridgeport's underperforming schools.  But Jessica believes that Jose and his Bridgeport peers deserve the same educational opportunities that his suburban peers enjoy.

---

[1]  ConnCAN, a Connecticut-based non-profit organization aimed at improving education outcomes for Connecticut's students, uses data from the Connecticut SDE's School Performance Index reports and student enrollment data to rank and grade all public schools in Connecticut.  Since 2006, ConnCAN has issued School Report Cards that assign letter grades to every Connecticut public school based on student achievement.  A grade of "A" means that the school meets the State goal and that nearly all students are on grade level.  Schools with this grade have a School Performance Index ranging from 88 to 100.  A grade of "B" means that the school performs above the State average, but below the state goal.  Schools with this grade have a School Performance Index ranging from 79 to 87.  A grade of "C" means that the school performs at or near the State average.  Schools with this grade have a School Performance Index ranging from 67 to 78.  A grade of "D" means that the school performs below the State average.  Schools with this grade have a School Performance Index ranging from 51 to 67.  And a grade of "F" means that the school is far below the State average and that most students are significantly below grade level.  Schools with this grade have a School Performance Index ranging from zero to 50.

40.     Dahlia Bryan's children have faced a similar fate, and have been compelled to attend one low-performing traditional district school after another, in Hartford.  Next year, three of Dahlia's children, Plaintiffs Jorr Moorley, Jaidyn Bryan, and Alec Patterson, will attend Sarah D. Rawson Elementary.  In 2013, Sarah D. Rawson Elementary's overall SPI was 59.5, nearly 10 points below the statewide average and roughly 30 points below the State goal of 88.  As such, the State has designated Rawson a Focus school, meaning that it substantially contributes to the achievement and graduation rate gaps within the State.  More recently, in the 2015-16 school year, only *15.5% and 8.9%* of Rawson students tested at or above Achievement Level on the SBAs in English Language Arts and Math, respectively.

41.     Plaintiff Dylon Frances attends another Focus school called Cesar A. Batalla School, in Bridgeport.  In 2013, Cesar A. Batalla School had an overall SPI of 42.7, roughly 25 points below the statewide average, and in 2015-16, only *11.1%* and *4%* of Cesar A. Batalla students scored at or above Achievement Level on the SBAs in English Language Arts and Math, respectively.  When Dylon ages out of Cesar A. Batalla School, he is zoned to attend Bassick High School, one the lowest-performing schools in the entire State.  In 2013, Bassick's overall SPI was a paltry 31—less than *half* the statewide average and 57 points below the State goal.  And in 2015-16, the substantial majority of Bassick students did not meet State standards: 66.4% of students failed to meet the Achievement Level in math and 60.5% failed to meet the Achievement Level in English Language Arts.

42.     As these Plaintiffs' experiences and the State's own data illustrate, tens of thousands of students across Connecticut are attending chronically failing schools that do not provide meaningful educational opportunities to the students in their charge.

### 2. Connecticut Knows That It Fails to Provide Minority and Low-Income Students with The Same Educational Opportunities as Other Students

43.     Although students across the State are at risk of being compelled to attend low-performing schools that will handicap them for life, that risk is particularly acute for Connecticut's low-income and minority students.  The State is well aware of this phenomenon.  Indeed, according to the State's own academic performance metrics, 91% of Connecticut's lowest-performing schools are located in the State's thirty lowest-income districts.

44.     This unequal access to educational opportunity has resulted in one of the widest achievement gaps in the Nation.  On the 2015 National Assessment of Educational Progress ("NAEP"),[2] for example, low-income students in Connecticut performed the fourth-worst and third-worst in the entire country in 4th grade and 8th grade math, respectively.  Less than 15% of Connecticut's African-American students are at or above proficiency in 4th grade math and reading and 8th grade math, while Connecticut's Hispanic students performed sixth-worst in the country in 4th grade math (19% at or above proficient) and second-worst in the country in 8th grade math (14% at or above proficient).  English Language Learners ("ELLs") in Connecticut also performed second-worst in the country in 8th grade math (only 1% at or above proficient) and tenth-worst in 8th grade reading (only 2% at or above proficient).

45.     By contrast, Connecticut's white and non-low-income student populations generally perform quite well academically, a harsh reminder that meaningful educational opportunities *can* be obtained, at least for those lucky enough to be born in the right ZIP code.

---

[2]  The National Assessment of Educational Progress is the largest nationally representative student assessment.  Released as "The Nation's Report Card," NAEP results are available for the nation, states, and participating urban districts.  NAEP results are based on representative samples of students at grades four, eight, and twelve, reflecting the geographical, racial/ethnic, and socioeconomic diversity of schools and students across the country.  These grades and ages were chosen because they represent critical junctures in students' academic progress.

The achievement gap between low-income and non-low-income students in Connecticut is the third-worst in the country for 4th grade math, the seventh-worst in the country for 4th grade reading, *the worst in the country* for 8th grade math, and the tenth-worst in the country for 8th grade reading.   The achievement gap between African-American and white students in Connecticut is no better; it is the sixth-worst in the country for 4th grade math, the third-worst in the country for 4th grade reading, the fifth-worst in the country for 8th grade math, and the third-worst in the country for 8th grade reading.  Similarly, the achievement gap among Hispanic and white students is the second-worst in the country for 4th grade math, the sixth-worst in the country for 4th grade reading, *the worst in the country* for 8th grade math, and the fourth-worst in the country for 8th grade reading.  Finally, the gap between ELLs and non-ELLs is second-worst in the country for 8th grade math and fifth-worst in the country for 8th grade reading.

46.     Put in another perspective, these achievement gaps mean that Connecticut's poor and minority students are falling several grade levels behind their more affluent and white peers—sometimes falling behind an entire grade level *in a single year*.   Connecticut's low-income students are approximately three grade levels behind their non-low income peers on *all* measures.  So, too, are Connecticut's African-American and Hispanic students, relative to their white peers.  Most dramatically, Connecticut's ELLs are more than five grade levels behind their non-ELL peers across all measures.

47.     These achievement gaps also result in deeply lopsided high school graduation rates between white and affluent students, on the one hand, and minority and low-income students, on the other hand—a tangible manifestation of the unequal educational opportunities afforded to those subgroups of students.  As the State's own data shows, in 2014, for example, the high school graduation rate for white students in Connecticut was 13.6% and 18.2% greater

than the graduation rate for black students and Latino students, respectively; the graduation rate for non-low-income students was 18% higher than the graduation rate for low-income students; and the graduation rate for non-ELLs exceeded the graduation rate for ELLs by 24.9%.

48.     Those poor and minority students who successfully complete high school—like Jose's mother, Jessica Martinez, and Dylon's father, Frankie Frances—have a much harder time than their wealthier, whiter peers at completing college within six years.  The State is cognizant of this fact: a recent study by the SDE showed a 31.5% gap between white and black students who complete college in six years, a 33.4% gap between white and Latino students who complete college in six years, and a 33.5% gap between non low-income and low-income students completing college in six years.  Lack of college readiness thus increases the need for college remediation and creates dramatic gaps in college completion rates between student groups.  Indeed, in the same study analyzing the graduation cohort of 2011, the State recognized that *the majority* of black (64.4%) and Hispanic (64.7%) students attending Connecticut community colleges or the four Connecticut state universities had been enrolled in at least one remediation course.

49.     These gaps have real-life consequences.  In 2013, the State median individual income in Connecticut was $44,592.  High school dropouts in the State, however, make about $22,000 less than this figure.  Even those students who successfully obtain a high school degree, but do not enroll in college, make roughly $11,000 less than the statewide median income.  And those who try their hand at college, but do not ultimately obtain a college degree, receive roughly $4,000 less than the median income.  These numbers are particularly troubling when viewed along race lines, as white households in Connecticut earn 45.8% more than their black counterparts and 48.8% more than their Latino counterparts.  And, since 70% of jobs in

Connecticut will require some post-secondary education by 2020, students trapped in schools that fail to equip them with the skills necessary for post-secondary success will be increasingly relegated to economic uncertainty and social isolation.

**B.     The State Knows Full Well That There Are Viable Alternatives to the Low Quality Schools That Have Failed Connecticut's Students and Relegated Them to Second-Class Citizenship**

**1.     Inter-District Magnet Schools**

50.     In addition to traditional district schools, Connecticut also maintains a system of public magnet schools.  Each type of magnet school is characterized by a number of factors, including student enrollment (demographic and geographic), the identity of the magnet school operator, the amount of time spent in the magnet program, the level of funding received by the magnet school, whether the magnet school receives State support and endorsement, and whether the magnet falls under the *Sheff v. O'Neill* settlement (described more fully below, *see infra* at ¶ 52).  These different types of magnet schools also fall into two broad umbrella categories: (1) intra-district magnets and (2) inter-district magnets.

51.     The most common type of magnet school is a full-time inter-district magnet school.  An inter-district magnet school is a publicly funded school designated to promote racial, ethnic, and economic diversity that draws students from more than one school district and offers a special or high-quality curriculum.  *See* Conn. Gen. Stat. § 10-264*l*(a).  Intra-district magnet schools, by contrast, are operated by local school districts and are relatively uncommon.

52.     There are two types of inter-district magnet schools in Connecticut:  (a) so-called *Sheff* magnets and (b) non-*Sheff* magnets.  *Sheff* magnets owe their name to the landmark case, *Sheff v. O'Neill*, 678 A.2d 1267, 1273 (Conn. 1996), in which the Connecticut Supreme Court ordered the State to integrate Hartford schools.  The *Sheff* lawsuit, brought by a collection of Hartford parents and students concerning unequal schooling conditions in the Hartford region,

resulted in a settlement agreement requiring that magnet schools in the Hartford region be reimbursed from the State at a higher rate for each pupil than other schools.  Non-*Sheff* magnets are those magnet schools outside the Hartford region that were not part of that case's settlement agreement.  Non-*Sheff* magnets receive a lower per-pupil reimbursement rate from the State compared to *Sheff* magnets.

53.     All inter-district magnet schools may be operated by one of these three entities: (1) a Regional Education Service Center ("RESC"); (2) a local school district (through the local board of education); or (3) a coalition of two or more local school districts or boards of education.[3]  Inter-district magnet schools must be approved by the Commissioner of Education, and approvals are granted through an application process.

54.     On average, magnet schools in Connecticut enroll about 72% minority students, 58% low-income students, and 7% English Language Learners.  These averages all meet or exceed the statewide average for each student group.

55.     In a recent multi-year longitudinal study, the SDE sought to answer the following question:  Are Connecticut's Choice programs—consisting of inter-district magnet schools, public charter schools (*see infra* at ¶¶ 61-75), and the Open Choice enrollment program (*see infra* at ¶¶ 76-81)—succeeding in helping urban students close the achievement gap by enabling them to make greater academic gains, compared to their peers in traditional public schools? From this longitudinal study, the SDE found that inter-district magnet schools operated by RESCs *significantly* outperform traditional district schools in improving the percentage of elementary school students (a cohort of students from grade 3 to 5) who scored either proficient

---

[3]  *Sheff* magnets may also be operated by boards of trustees of the State's higher education constituent units or independent colleges or universities, or any other non-profit approved by the Commissioner of Education.

or at goal in both mathematics and reading. In other words, the State knows—based on its own study—that inter-district magnet schools are a superior alternative to its traditional district schools that are failing to provide thousands of children with a minimally adequate education.

56. The following tables reflect the findings of the SDE's longitudinal study:

Table 1. Cohort 1 CMT Growth (Grades 3 to 5) at Proficient level

| | N | % Proficient on 2010 CMT | 2010 gap % | % Proficient on 2012 CMT | 2012 gap % | Change in % Proficient |
|---|---|---|---|---|---|---|
| Nonurban schools | 18,318 | 78.9 | -- | 85.2 | -- | 6.3 |
| Urban students | | | | | | |
| Urban schools (non-Choice) | 2,496 | 43.9 | -35.0 | 48.3 | -36.9 | 4.4 |
| Public charter schools | 184 | 63.6 | -15.3 | 58.2 | -27.0 | -5.4 |
| Magnet schools operated by local districts | 353 | 48.4 | -30.5 | 58.1 | -27.1 | 9.7 |
| Magnet schools operated by RESCs | 55 | 58.2 | -20.7 | 83.6† | -1.6 | 25.4† |
| Open Choice program | 89 | 47.2 | -31.7 | 66.3‡ | -18.9 | 19.1† |

Table 2. Cohort 1 CMT Growth (Grades 3 to 5) at Goal level

| | N | % Goal on 2010 CMT | 2010 gap % | % Goal on 2012 CMT | 2012 gap % | Change in % Goal |
|---|---|---|---|---|---|---|
| Nonurban schools | 18,318 | 59.1 | -- | 71.3 | -| | 12.2 |
| Urban students | | | | | | |
| Urban schools (non-Choice) | 2,496 | 21.6 | -37.5 | 29.8 | -41.5 | 8.2 |
| Public charter schools | 184 | 39.7 | -19.4 | 41.3 | -30.0 | 1.6 |
| Magnet schools operated by local districts | 353 | 26.6 | -32.5 | 38.0 | -33.3 | 11.4 |
| Magnet schools operated by RESCs | 55 | 34.5 | -24.6 | 56.4† | -14.9 | 21.9† |
| Open Choice program | 89 | 24.7 | -34.4 | 36.0 | -35.3 | 11.3 |

57. The State also knows that magnet schools offer considerable promise to low-income students of color in Connecticut's inner cities. In Hartford, for example, the Montessori

Magnet School serves 43.5% low-income, 26.8% African-American, and 39.7% Hispanic students, and all three groups perform above the statewide average. Montessori Magnet boasted an overall SPI of 84 in 2013, well above the statewide average of 67. What's more, Montessori Magnet is one of the State's highest performing schools for African-American students. In 2015-16, Montessori Magnet continued to outperform nearby traditional district schools in the Hartford School District.

58.    In Bridgeport, Multicultural Magnet School serves 100% low-income, 19.7% African-American, 64.3% Hispanic, and 15.1% English Language Learner students, and is one of the State's highest performing schools for African-American Students, Hispanic students, and low-income students. In 2013, Multicultural Magnet earned an "A" grade from ConnCAN on its annual "School Report Card," and had an overall school performance index of 88.9, including an astounding 90.2 in math and 92.4 in writing. In 2015-16, Multicultural out-performed *every* traditional district school in Bridgeport on the SBA, with 65.9% and 50.3% of its students performing at or above Achievement Level in English Language Arts and Math, respectively.

59.    Finally, in New Haven, the Engineering-Science University Magnet School has also performed well and, in 2013, had an overall SPI of 87.4, roughly the State goal and well above average. The Engineering-Science University Magnet School serves a student body that is 58.3% low-income, 44.9% African-American, and 16.8% Hispanic. In 2015-16, Engineering-Science University Magnet School continued to out-perform the majority of traditional district schools in New Haven on the SBAs, with 57.4% and 43.8% of its students performing at or above Achievement Level in English Language Arts and Math, respectively.

60.    These are but a handful of the promising inter-district magnet schools that the State knows can provide a diverse array of students with high-quality educational opportunities.

But they are not the only high-quality public alternatives to traditional district schools for poor and minority students in Connecticut.

### 2. Charter Schools

61.     In 1996, "the General Assembly and Governor enacted legislation establishing charter schools in Connecticut, seeking to catalyze innovation in the State's public schools, as well as to establish another vehicle to reduce the racial and economic isolation of Connecticut's public school students." Conn. SDE Biennial Report on the Operation of Charter Schools in Conn. 2014 at 1.

62.     A charter school is a public, nonsectarian school that is established under a charter, organized as a nonprofit entity, and operated independently of any local or regional board of education. *See* Conn. Gen. Stat. § 10-66aa. There are two main types of public charter schools in Connecticut, (1) a State charter school that must be approved by the Connecticut State Board of Education ("SBE"); and (2) a local charter school, which is a former traditional public school or part of a converted traditional public school that must be approved by the local or regional board of education of a school district and also by the SBE. Conn. Gen. Stat. §§ 10-66aa; 10-66bb(e), (f). For the 2015-16 school year, there were twenty-four charter schools (twenty-three State charter schools and one local charter school) in Connecticut, all located in twelve host districts.

63.     In exchange for greater autonomy, charter schools are subject to heightened accountability. All charter schools operate on a strictly provisional basis, subject to continuous review and re-authorization by the SBE every two to five years. The SBE examines a charter school's record of improving student achievement, support in the community, adherence to laws and regulations, and other factors before deciding whether to renew a school's charter. Charter

schools that do not meet the SBE's standards are given shortened renewal periods, placed on probation, or closed altogether.

64.     For the 2015-16 school year, 85% of the students enrolled in Connecticut's charter schools were African-American or Hispanic and 70% were low-income—far in excess of the statewide average for each student group.

65.     The State knows that charter schools offer poor and minority students superior educational opportunities as compared to failing traditional district schools.  According to the SDE, Connecticut's "public charter schools have demonstrated an ability to work towards closing the achievement gap for student bodies that are made up predominately of students of color and from disadvantaged socio-economic backgrounds." Conn. SDE Biennial Report on the Operation of Charter Schools in Conn. 2014 at 1.  Indeed, the State itself has recognized that "city resident students who attend charter schools outperform students in the city public schools in reading and mathematics, and have achieved at or above proficiency at a greater rate than city public school students between 2009 and 2012 in both subject areas." *Id.* at 11.  As the State has acknowledged, "[t]hese results are noteworthy given that the majority of charter school students reside in the state's priority school districts, which serve academically high-risk students." *Id.*

66.     The following chart from the SDE's 2014 Biennial Report on the Operation of Charter Schools in Connecticut shows the percentage of Hartford, New Haven, and Bridgeport residents at or above proficiency in reading, in both charter schools and traditional public schools:



Conn. SDE Biennial Report on the Operation of Charter Schools in Conn. 2014 at 6. As the State's own official report shows, charter schools offer greater promise than many traditional district schools when it comes to getting children in the State's highest-risk districts to meet or exceed proficiency in fundamental skills like reading.

67.     Of the fourteen charter schools that administered the 2013 CMT for grades 3-8, twelve charter schools (or 86%) outperformed their host districts, as measured by their SPI. Similarly, of the six charter schools that administered the Spring 2013 Connecticut Academic Performance Test for grade 10, five schools (or 83%) outperformed their host districts, as measured by their SPI.

68.     In a longitudinal study released by the SDE in 2015, *see infra* at ¶ 55, the SDE also concluded that charter schools significantly outperform traditional district schools in improving the percentage of middle school students (a cohort of students tracked from grade 6 to 8) who score either proficient or at goal in both mathematics and reading.

69.     The following tables reflect the findings of the SDE's longitudinal study:

Table 3. Cohort 2 CMT Growth (Grades 6 to 8) at Proficient level

|  | N | % Proficient on 2010 CMT | 2010 gap % | % Proficient on 2012 CMT | 2012 gap % | Change in % Proficient |
|---|---|---|---|---|---|---|
| Nonurban schools | 19,246 | 89.0 | -- | 90.8 | -- | 1.8 |
| Urban students |  |  |  |  |  |  |
| Urban schools (non-Choice) | 2,352 | 61.3 | -27.7 | 59.6 | -31.2 | -1.7 |
| Public charter schools | 326 | 73.3 | -15.7 | 81.3† | -9.5 | 8.0† |
| Magnet schools operated by local districts | 512 | 69.9 | -19.1 | 69.3 | -21.5 | -0.6 |
| Magnet schools operated by RESCs | 96 | 75.0 | -14.0 | 75.0 | -15.8 | 0.0 |
| Open Choice program | 76 | 72.4 | -16.6 | 75.0 | -15.8 | 2.6 |

Table 4. Cohort 2 CMT Growth (Grades 6 to 8) at Goal level

|  | N | % Goal on 2010 CMT | 2010 gap % | % Goal on 2012 CMT | 2012 gap % | Change in % Goal |
|---|---|---|---|---|---|---|
| Nonurban schools | 19,246 | 73.6 | -- | 75.2 | -- | 1.6 |
| Urban students |  |  |  |  |  |  |
| Urban schools (non-Choice) | 2,352 | 37.8 | -35.8 | 32.9 | -42.3 | -4.9 |
| Public charter schools | 326 | 49.4 | -24.2 | 60.1† | -15.1 | 10.7† |
| Magnet schools operated by local districts | 512 | 39.5 | -34.1 | 34.2 | -41.0 | -5.3 |
| Magnet schools operated by RESCs | 96 | 42.7 | -30.9 | 45.8 | -29.4 | 3.1 |
| Open Choice program | 76 | 40.8 | -32.8 | 31.6 | -43.6 | -9.2 |

† Exceeds empirical cut value

70.    According to the SDE, "students in cohort 2 (Grade 6 2010 to Grade 8 2012) benefitted more from public charter schools both in performance gains and absolute gap closure at Proficient as well as Goal and [math and reading] . . . ." Conn. SDE, March 2015, Evaluating the Academic Performance of Choice Programs in Connecticut at 7.

71.    Notwithstanding the success that Connecticut's charter schools have achieved for the students lucky enough to attend them, the State actively prevents Connecticut families from

obtaining the same access to charter schools that families in nearby states enjoy.  According to

the SDE, there were just eighteen State charter schools in operation in Connecticut serving

approximately 7,100 students during the 2013-14 school year, representing a mere 1.3% of

Connecticut's public-school students.  By contrast, and as reflected in the following chart,

charter schools served far larger percentages of the overall student populations in adjacent states

in 2013-14:

| State | Number of charter schools | Percentage of students in charter schools | Number of students in charter schools |
|---|---|---|---|
| Connecticut | 18 | 1.3% | 7,131 |
| Massachusetts | 81 | 3.3% | 31,380 |
| New York | 233 | 3.0% | 77,354 |
| Rhode Island | 19 | 3.6% | 6,215 |

The number of charter schools in Connecticut inched up slightly in 2015-16 (to 24 schools), but

the percentage of the student population served by Connecticut's charter schools remains far

behind nearby states, and certainly well below the demand for high-quality charter schools

within Connecticut.  Indeed, during the 2015-16 school year, just 1.5% of all the public-school

students in Connecticut attended public charter schools.

72.    This lack of access is particularly troubling, given how strongly many of

Connecticut's public charter schools perform.  Amistad Academy in New Haven, for example,

consistently performs among the best schools in the entire State.  In fact, the SDE listed Amistad

Academy as one of 84 "Schools of Distinction" in 2014-15.  Of those 84 schools, Amistad was

one of only 35 to receive a distinction for Highest Performing Overall and Highest Performing

Subgroup, meaning that it was in the top 10% of schools overall according to SDE's

accountability index *and* it was in the top 10% of points earned for a high needs subgroup.  In

2013, Amistad had an overall school performance index of 81.1, including a nearly perfect 98.8

score for writing.  Moreover, the school served a student body that was 81.1% low-income, 62.8% African-American, and 34.6% Hispanic.

73.     Another nearby charter school in New Haven, Elm City College Preparatory School, earned an overall SPI of 79, including a subject-specific performance index of 84.3 in math and 86.3 in writing.  At that time, 74% of Elm City's students were low-income, and the student body was 77.3% African-American and 20.4% Hispanic.

74.     In Bridgeport, Achievement First Bridgeport Academy (Upper), also offers its students a high-quality education compared to many nearby traditional district schools.  In 2013, Achievement First Bridgeport (Upper) had an overall SPI of 77.6, more than 10 points higher than the statewide average and even farther above many of its peer traditional district schools in the Bridgeport area, many of which are among the lowest performing schools in the State. Notably, the school boasted an SPI of 81.6 for mathematics and 95.4 for writing.  During 2013 (the year from which these SPI scores are drawn), Achievement First Bridgeport served 82.2% low-income students and African-Americans and Hispanics made up 55% and 42.5% of its student body, respectively.

75.     These examples show that high-quality charter schools are viable options that *can* provide parents of children in Connecticut's urban school districts an alternative to chronically failing traditional district schools.  The State is fully aware of this fact, yet, as explained below, actively thwarts the expansion of these superior alternatives to failing traditional district schools.

### 3.     Open Choice Program and High-Performing Traditional District Schools

76.     Connecticut operates a program called Open Choice, which is intended to allow students to attend traditional district schools in other districts on a space-available basis.  Conn. Gen. Stat. § 10-266aa.  The stated purpose of this program is to "(1) [i]mprove academic achievement; (2) reduce racial, ethnic and economic isolation or preserve racial and ethnic

balance; and (3) provide a choice of educational programs." *Id.* § 10-266aa(b).  It is ostensibly designed to allow urban students in Hartford, New Haven, Bridgeport, and New London—predominantly low-income and minority districts—to attend public schools in nearby suburban towns while also allowing suburban and rural students to attend public schools in the nearby urban center. *See id.* § 10-266aa(c).

77.     Studies have shown that students lucky enough to participate in the Open Choice program have outperformed their peers at traditional public schools.  In the same multi-year longitudinal study described above, *see supra* ¶ 55, the Open Choice program demonstrated a substantial 19.1% gain in math and reading proficiency for grades 3 to 5 on the Connecticut Mastery Test.

78.     This is unsurprising, as urban school districts with low-quality schools are often adjacent to high-quality traditional schools, mainly in predominately white districts, where low-income and minority students who use the Open Choice program can thrive.  In Trumbull, which borders the Bridgeport School District and is not far from the Winthrop School that Plaintiff Jose Martinez attends, Frenchtown Elementary School received an "A" grade on ConnCAN's Report Card 2013 and boasted an overall SPI of 89.5, above the State goal of 88.  On the 2015-2016 SBA test, 82% and 76.2% of Frenchtown students met the Achievement Level in English Language Arts and math, respectively—well above the respective State averages of 55.7% and 44%.

79.     Just outside Hartford, in the neighboring district of West Hartford, the Morley School offers higher-quality education than many traditional district schools in Hartford.  In 2013, the Morley School earned an overall SPI of 92.2, including a score of 94.2 in writing, 92.5 in reading, and 92.6 in math.  On the 2015-16 SBA, 74.8% and 66.9% of Morley students—

higher than the State averages of 55.7% and 44%—were at or above Achievement Level for English Language Arts and Math, respectively.

80.    And just outside New Haven, in the district of West Haven, at the Edith E. Mackrille School, 75.5% and 67% of students performed at or above Achievement Level on the 2015-2016 SBAs in English Language Arts and Math, respectively—demonstrably higher than the respective State averages of 55.7% and 44%.

81.    Like magnet schools and charter schools, these traditional public schools in neighboring school districts afford high-quality alternatives to the many chronically failing traditional schools in the Plaintiffs' districts.

C.    **Through Its Anti-Opportunity Laws, Connecticut Knowingly Deprives Poor and Minority Students of Their Fundamental Rights to Liberty and Equality**

   1.    **Inter-District Magnet School Moratorium**

82.    Given the substantial academic gains that magnet schools can offer to the low-income and minority students who attend them and the State's own extensive data confirming this fact, one would expect the Connecticut General Assembly to embrace magnet schools and do everything in its power to encourage the opening and expansion of high-achieving magnet schools.   Connecticut, however, has taken the exact opposite approach, instead opting to intentionally impede the availability of such superior alternatives and compelling students to attend failing traditional district schools that it knows are hurting low-income and minority school children.

83.    Currently, just 106 magnet schools operate in the entire State of Connecticut, including 82 inter-district magnet schools.   That number is not a function of supply and demand, but rather artificial legal constraints that the State intentionally imposes despite its knowledge of the dramatic benefits that magnet schools offer.   In 2009, the General Assembly passed Public

Act 09-6, which prohibits the construction of new inter-district magnet schools, ostensibly until Connecticut's Commissioner of Education assesses magnet schools' performance and develops a comprehensive statewide magnet school plan.[4]   *See* Public Act No. 09-6, § 22 (Spec. Sess.) (imposing a "moratorium [that] lasts until the [C]ommissioner develops a comprehensive magnet school plan.").

84.    Although Connecticut's magnet school moratorium directed the Commissioner of Education to submit her comprehensive state-wide inter-district magnet school plan on or before January 1, 2011, the Commissioner failed to timely submit her inter-district magnet plan, and still has not done so.  As a result, the magnet school moratorium remains in place, preventing the opening or expansion of schools with a proven track record of success.

85.    Consequently, while any public-school student is theoretically eligible to attend an inter-district magnet school, in reality the demand far outstrips the artificially limited supply. When the number of applicants exceeds the number of spots, magnet schools conduct a lottery to determine which few lucky students will fill the limited spaces available.  In 2013-14, for example, roughly 20,000 Hartford students applied for 5,000 seats, pre-K through 12th grade, at forty schools in the Magnet-Open Choice Lottery operated by the Greater Hartford Regional School Choice Office.  In 2015, roughly *15,000* students were placed on waitlists for Hartford magnet schools or suburban public schools participating in Open Choice Enrollment.  The latest school year was more of the same, as thousands of students seeking admission to magnet schools in Hartford, New Haven, and Bridgeport ended up on waitlists.

---

[4]  The moratorium does not apply to magnet schools that "the commissioner determines will assist the state in meeting the goals" of the *Sheff* settlement.  Public Act No. 09-6, § 22 (Spec. Sess.); *see also* Conn. Gen. Stat. § 10-264*l*(b)(1).

## 2.    Charter School Cap

86.    Despite charter schools' significant potential to help inner-city low-income and minority students to close the achievement gap with their more affluent suburban peers, a mere twenty-four charter schools operate in the entire State, serving a mere 1.5% of the student population—one of the lowest rates of any state in the nation.

87.    The number of charter schools in Connecticut has barely grown in recent years and is certainly not growing quickly enough to meet student needs.  This is not because of a lack of demand from Connecticut students who wish to escape their failing district schools.  Nor is it because of a lack of high-performing charter school networks that wish to, and have the ability to, operate in Connecticut.  On the contrary, it stems directly from legal constraints deliberately imposed by the State—constraints that the State imposes even though it knows charter schools offer alternatives that enable poor and minority children to avoid the harm caused by notoriously failing traditional district schools.

88.    Connecticut intentionally and effectively caps the ability of charter school operators to open new schools and to maintain or expand existing schools in the State.  Unlike traditional public schools, which automatically receive per-pupil funding for each student they enroll, charter schools are forced to depend on the shifting whims of the General Assembly to provide them with the support necessary to keep their doors open.  Every year, the General Assembly must decide whether or not to appropriate funding to charter schools, irrespective of whether those schools have a proven track record or success.  *See* Conn. Gen. Stat. § 10-66bb(a)(2).  Even if a charter school operator receives an initial certificate of approval from the SBE, the General Assembly has the ultimate authority to prevent charter school growth through the purse strings.  *See* Conn. Gen. Stat. § 10-66bb(a)(1).

89.     In 2006, for example, a group of education advocates sought to open a math and science charter school in Hartford.  Although the SBE granted approval for the school, the General Assembly did not pass funding for any new charter schools that year.

90.     More recently, in April 2015, the General Assembly's Appropriation Committee refused to allocate sufficient funding to open both Capitol Harbor Prep Charter School and the Stamford Charter School for Excellence, even though both charter schools had received approval from the SBE the previous year to open in Fall 2015.  Based on the SBE's approval, Capitol Harbor Prep had conducted a lottery for the 250 slots it assumed it would be able to offer.  But as a direct result of the Anti-Opportunity Laws, charter school operators and hundreds of students were left in limbo for months until the Governor's office finally convinced the General Assembly to restore the schools' funding.

91.     Even when a charter school operator does obtain an initial certificate and the General Assembly appropriates funds for it to open, further barriers remain.  Although State charter schools are theoretically entitled to $11,000 every year "for each student enrolled in such school," Conn. Gen. Stat. § 10-66ee(d)(1), this sum is paid out in installments and the fourth installment, "[n]otwithstanding the provisions of this subdivision," "shall be *within available appropriations* and *may be adjusted* for each student on a pro rata basis." *Id.* (emphasis added). As a result, even properly credentialed State charter schools are at risk of receiving only three-quarters of that sum—a mere $8,250—in annual per-pupil funding from the State.  And while local charter schools are eligible to receive $3,000 from the State in addition to local funding, that amount is discretionary and subject to the availability of funding.  *See* Conn. Gen. Stat. § 10-66ee(c)(1).

92.     Because charter schools typically offer a single grade level during their first year and thereafter add grade levels as students progress, charter school operators that manage to beat the odds and open up charter schools in Connecticut never know whether they will be able to complete their schools, or whether the General Assembly will withhold monetary support before that can happen.

93.     In fact, not even existing, fully completed charter schools already operating in Connecticut are safe.  Because the General Assembly may refuse to provide necessary support to charter schools in any given year—regardless of the academic performance or history of those schools—charter school operators are constantly caught in the cross-hairs of the uncertain political process.  And students who attend charter schools are left not knowing whether their schools will even exist the following year.  In recent years, three charter schools—Ancestors Community High School (Waterbury), Charter Oak Preparatory Academy (New Britain/Hartford), and Cross Cultural Academy of Arts and Technology (Hartford)—had to close and relinquish their charters to the SBE due to "insufficient funds to operate the program."  And in 2013, when the State reduced per-pupil grants to charters by $300 per student in the middle of the school year, it left charter operators to scramble to cover the unanticipated shortfall.

94.     In practice, these intentionally levied barriers to charter school growth severely limit the ability of charter schools to enter or flourish in Connecticut.  Charter school operators are strongly disincentivized from trying to open new charter schools in Connecticut because they know that even if they mobilize the community, submit an excellent charter school petition, and obtain initial charter approval from the SBE, the General Assembly might *still* refuse to support them for any (or no) reason at all.

95.     The result is that Connecticut has far fewer charter schools per student than other states and cannot adequately increase the size or number of charter schools to meet the demand for high-performing alternatives to failing traditional district schools.  In 2015-16, whereas Connecticut had only twenty-four charter schools, the majority of states each had at least fifty operating charter public schools, and twenty states boasted more than 100 operating charter schools.  While many of these states saw strong increases in the number of new charter schools—adding between ten and eighty new schools—Connecticut stalled, adding only two new charter schools.

96.     The strong presence and rapid expansion of high-performing charter school networks in nearby states, when juxtaposed against the stagnation within Connecticut, confirms that the Anti-Opportunity Laws are strongly disincentivizing successful charter school networks from opening schools in Connecticut.  For example, Knowledge Is Power Program ("KIPP"), a nationally renowned charter school network, operates thirteen charter schools in New York, five charter schools in Pennsylvania, sixteen charter schools in Washington, D.C., two charter schools in Maryland, five charter schools in Massachusetts, and eleven charter schools in New Jersey.  But KIPP operates *zero* charter schools in Connecticut—a direct result of Connecticut's Anti-Opportunity Laws.  Similarly, Uncommon Schools, another charter school operator with a successful track record of closing the achievement gap, operates four charter schools in Massachusetts, fifteen charter schools in New Jersey, and twenty-nine charter schools in New York.  Yet, it, too, operates *zero* charter schools in Connecticut.  Charter schools like those operated by KIPP and Uncommon Schools offer real promise to children from underserved communities.  A recent study by the Center for Research on Educational Outcomes concluded that charter schools in Boston have a positive effect that equates to *200 additional learning days*

in math and *150 additional learning days* in reading each school year.  If the Anti-Opportunity Laws did not exist, charter school operators such as KIPP and Uncommon Schools undoubtedly would open a network of charter schools in Connecticut, thereby giving thousands of Connecticut's inner-city students an opportunity to escape the failing schools that the State compels them to attend.

97.    Consequently, while any public-school student is theoretically eligible to attend a charter school, in reality the demand far outstrips the artificially limited supply.  Indeed, according to the SDE, "[t]he number of charter school seats is growing but is not yet keeping up with the demand."  Conn. SDE Biennial Report on the Operation of Charter Schools in Conn. 2014 at 1.  And because the number of students wishing to attend charter schools exceeds the number of spots available, charter schools must resort to a lottery system to fill the limited spaces available.  Conn. Gen. Stat. § 10-66bb(d)(8).  In 2012-2013, *4,273 students* were wait-listed for charter schools.  In 2014-2015, the number of wait-listed students unable to attend charter schools in Connecticut increased to 5,868.

98.    Thousands of students are stuck on charter-school wait lists, trying to gain admission and escape the failing traditional schools they would otherwise be forced to attend. The State knows these waitlists all too well, as it codified the lottery mechanism for deciding which students will be fortunate enough to attend and which students will be turned away (*see* Conn. Gen. Stat. § 10-66bb(d)(8)) and keeps extensive data on the subject.  According to the CDE, "[t]he number of students on wait lists has . . . remained high from 4,186 to 4,273 between 2009-10 and 2012-13.  In 2012-13, the number of students on waitlists was 66% of the students enrolled.  The demand for charter schools is high while the rate of future expansion is dependent

on legislative support."  Conn. SDE Biennial Report on the Operation of Charter Schools in Conn. 2014 at 9.

99.    For virtually all students who are denied admission to these high-performing public charter schools, there is no other opportunity but to turn back to the very same traditional district schools that have failed them year after year.  The State knows this, yet it actively prevents these students from obtaining a meaningful education through its laws restricting charter school expansion.

3.    **The State Effectively Caps the Number of Students Who May Participate in the Open Choice Program by Knowingly Penalizing Districts That Participate in the Program**

100.    As discussed above, *see supra* ¶ 76, the Open Choice program is an inter-district public-school attendance program primarily available to students in Hartford, Bridgeport, New Haven, New London, and their surrounding districts.  *See* Conn. Gen. Stat. § 10-266aa.

101.    School districts offer enrollment in the Open Choice program on a space-available basis in grades K through 12.  Unfortunately, as the State itself knows, the Open Choice program has built-in disincentives that effectively cap the number of students that recipient school districts may accept.  When the number of applications exceeds the spaces available, schools are forced to use lotteries—a twisted game of pure chance—to determine which students may attend.

102.    The Open Choice program's funding is determined through the State's Education Cost Sharing ("ECS") grant formula.  The ECS formula sets a goal for per pupil expenditures (roughly $11,525 per student) and then determines how much the State will contribute to that goal for each town based on the number of students the town educates and the town's own ability to contribute based on its property wealth and income.

103.   The ECS formula is adjusted for schools participating in the Open Choice program.  But receiving districts that participate in Open Choice may count only *one-half* of each Open Choice student when reporting to the State the number of students in their districts.  Conn. Gen. Stat. § 10-266aa(h).  Thus, a school district that receives a student from a sending school district must shoulder virtually all of the actual costs that are necessary to educate an additional student—including any additional infrastructure and staffing costs—yet that same receiving school district may only count the transferred student as *one-half* of a student for purposes of the ECS grant formula.

104.   Thus, schools that participate in the Open Choice program stand to receive far less funding for each out-of-district student they host than if they had instead added another student from *within* the district.  The Open Choice program instead provides recipient school districts with just a fraction of the financial support necessary for them to accept incoming high-needs students.  As a result, the Open Choice program has a built-in financial disincentive that causes far too few school districts to open up far too few seats for students in need.  The State knows this to be the case, yet it actively prevents more students from participating by creating skewed incentives and making the program voluntary for districts.

105.   For example, the regional education service center that administers the Open Choice program for Fairfield County—a suburban school district near Bridgeport—held only a first-grade lottery in 2012 because there were not any seats available in higher grades.  Likewise, in Hartford, neighboring school district superintendents have repeatedly enrolled far fewer students than requested by the State's Education Commissioner.  In 2015, for example, the State's Education Commissioner asked Simsbury School District to enroll twenty additional Open Choice students from the inner-city, but Simsbury officials declined to do so.  All told, of

the twenty-six districts near Hartford eligible to participate in the Open Choice program in 2015, seven *decreased* the number of inner-city students and three enrolled the same number as the year before.

106.    Furthermore, because participation in the Open Choice program is voluntary, the program's funding structure disincentivizes suburban districts from participating in the first place.  *See* Conn. Gen. Stat. § 10-266aa(c), (e).

107.    Only 2,086 students statewide participated in the program in 2012—just 0.37% of the public-school students in Connecticut.

108.    Consequently, while any public-school student living in a qualifying Open Choice district is theoretically eligible to attend a traditional district school in a neighboring district, in reality the demand far outstrips the artificially limited supply.  When "there are more students who seek to attend school in a receiving district than there are spaces available, the regional educational service center shall assist the school district in determining attendance by the use of a lottery." Conn. Gen. Stat. § 10-266aa(e).  The waitlists for students trying to take advantage of the Open Choice program to attend higher-performing traditional schools in different districts— like the waitlists for high-performing magnet and charter schools—have been staggering.  In 2015, only 790 of the more than 2,500 students across Connecticut who participated in the lottery—just 30%—won a spot in one of the higher-performing Open Choice-participating schools to which they applied.  In Bridgeport, for example, there are generally only thirty openings a year across all grades for more than 600 applicants.

109.    As these examples demonstrate, Connecticut's Open Choice program—though ostensibly designed to "provide a choice of educational programs" to Connecticut's poor and

minority populations, Conn. Gen. Stat. § 10-266aa(b)—knowingly leaves thousands of Connecticut's most vulnerable students languishing in chronically-failing schools.

### 4.      The Plaintiffs Have Suffered Harm as a Result of the Anti-Opportunity Laws

110.    The Plaintiffs are all too familiar with the lotteries and inevitable waitlists that follow as a direct result of the Anti-Opportunity Laws.

111.    Plaintiff Jessica Martinez started applying for her son, Jose Martinez, to attend higher-performing magnet schools in Bridgeport since he was in pre-kindergarten. Every year— as a direct result of the Anti-Opportunity Laws—Jose has ended up on the waitlist because he was not selected in the lottery. When Jose ages out of Winthrop School in two years, Jessica intends to apply again to higher-performing magnet schools so that he does not have to go to Harding High School, which is among the State's lowest performing schools. Jessica also plans to apply to higher-performing traditional district schools through the Open Choice program and to higher-performing charter schools, but she fears that Jose will continue to be waitlisted for these opportunities as a direct result of the Anti-Opportunity Laws.

112.    Plaintiff Leslie Rodriguez had a similar experience applying on behalf of her granddaughter, Nina Martinez, to higher-performing magnet and charter schools. Every year since Nina was in kindergarten, Leslie has applied to higher-performing magnet and charter schools through the lottery. And each year—as a direct result of the Anti-Opportunity Laws— Nina has ended up on the waitlist, dozens of spots below any number that could conceivably lead to admission. Leslie plans to continue applying to higher-performing magnet and charter schools, as well as to higher-performing traditional district schools through the Open Choice program, but she fears that Nina will continue to be waitlisted for these opportunities as a direct result of the Anti-Opportunity Laws.

113.   In a particularly cruel twist of fate, Plaintiff Dahlia Bryan has actually won admission to a thriving charter school—but only for one of her five children.  For her other children—including Jorr, Alec, and Jaidyn—the only available school options are the same underperforming district schools that have failed them time and time again.  And even for Curtis, who was lucky enough to gain admission to a charter school, there is still no guarantee that Curtis's school will remain open or continue to serve as many students, due to the Anti-Opportunity Laws.

114.   Plaintiff Frankie Frances has also done everything he can to ensure a better education for his son, Dylon Frances.  Frankie has repeatedly applied for magnet and charter schools for Dylon since he was in pre-kindergarten.  But, like the rest of the Plaintiffs—and as a direct result of the Anti-Opportunity Laws—Dylon has ended up on the waitlist each year.

**D.   Connecticut's Anti-Opportunity Laws, Individually and Collectively, Deprive the Plaintiffs of Their Fundamental Rights to Liberty and Equality Under the U.S. Constitution**

115.   As a direct result of the Anti-Opportunity Laws, both individually and collectively, Connecticut knowingly prevents thousands of poor and minority students from accessing a meaningful education, let alone obtaining the far superior educational opportunities available to their more privileged wealthy and white peers across the State.

116.   In the absence of the Anti-Opportunity Laws, poor and minority students zoned for low- and under-performing traditional district schools would be able to escape their failing traditional district schools and attend higher-performing magnet, charter, or neighboring district schools.

117.   In the absence of the Anti-Opportunity Laws, new high-performing magnet and charter schools would open to serve more poor and minority students and accommodate the thousands of students on waitlists, while already high-performing magnet, charter, and traditional

district schools would expand their spots to serve more poor and minority students and meet the demand for quality education.

118.    In other words, through its Anti-Opportunity Laws, Connecticut is knowingly forcing thousands of children to attend failing schools, in violation of the students' federal equal protection and due process rights.

**1.    The Federal Commitment to Providing High-Quality Public Education Harkens Back to the Founding**

119.    The federal government's involvement in public education dates back to the time of the founding.  On the eve of the Constitutional Convention, the United States Continental Congress adopted the Land Ordinance Act of 1785 and the Norwest Ordinance of 1787, which "established a series of trust relationships between the federal government and the states, in which the government granted the asset (land) to be held in a trust and used to support a system of schools in a state."  *See* Center On Education Policy, *Public Schools and the Original Federal Land Grant Program* (2011), available at http://files.eric.ed.gov/fulltext/ED518388.pdf.

120.    The Land Ordinance divided the United States' new terrain into townships of thirty-six square miles and, by reserving one square mile of each township to be used for the maintenance of a public school, specifically emphasized the importance of public education.  *See* An Ordinance for Ascertaining the Mode of Disposing of Lands in the Western Territory (May 20, 1785), 28 Journals Continental Congress 375, 378 (1933).

121.    The Northwest Ordinance, for its part, established a process by which territories could apply for statehood and set out certain requirements each prospective state had to meet to obtain school land grants.  *See* Northwest Ordinance of 1787 art. III, reprinted in 1 U.S.C., at LVII (2006).  Like the 1785 Land Ordinance Act, the 1787 Northwest Ordinance promoted education as a key principle of governance, declaring:  "Religion, morality, and knowledge,

being necessary to good government and the happiness of mankind, schools and the means of education *shall forever be encouraged*."  1 U.S.C., at LVII (emphasis added).

122.    These two ordinances "laid the groundwork 'for a policy of universal, free, public education.'"  Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 115 (2013) (quoting Molly O'Brien & Amanda Woodrum, *The Constitutional Common School*, 51 Clev. St. L. Rev. 581, 592 (2004)).

### 2.    States Have Long Provided Public Education Options

123.    The states' commitment to education also harkens back to the founding era.  *See Hadley v. Junior College Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 56 (1970) ("Education has traditionally been a vital government function . . . .").  Indeed, six of the initial thirteen states included express education clauses in their constitutions.  *See* Mass. Const. ch. V, § 2; N.H. Const. pt. II, art 83; Pa. Const. of 1776, § 44; N.C. Const. of 1776, § XLI; Vt. Const. of 1777, ch. II, § XL; Ga. Const. of 1777, art. LIV.

124.    This commitment remained steadfast through the Civil War era.  By 1868—when the Fourteenth Amendment was ratified—thirty-six out of thirty-seven states included constitutional provisions obligating state governments to provide public education to all students. The scope of this duty was broad, requiring legislatures to establish or maintain schools, and to provide adequate financial support to make such schooling free.

125.    Indeed, the Mississippi Constitution of 1868, which "was typical," Friedman & Solow, 81 Geo. Wash. L. Rev. at 125, provided:

> [I]t shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade.

Miss. Const. of 1868, art. VIII, § 1; *see also* Ohio Const. of 1851, art. VI, § 2; Minn. Const. art. XIII, § 1 (amended 1974); W. Va. Const. of 1872, art. XII, § 1; S.C. Const. of 1868, art. X, §§ 3-4; Pa. Const. of 1874 art. X, § 1; N.C. Const. of 1868, art. I, § 27.

126.    By 1918, at the close of the First World War, education had become compulsory in every state.  Friedman & Solow, 81 Geo. Wash. L. Rev. at 115; Gershon M. Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills*, 63 Tex. L. Rev. 777, 823 (1985).

127.    These trends continued over the ensuing century.  Indeed, every single state constitution now contains a provision on education.  *See* Friedman & Solow, 81 Geo. Wash. L. Rev. at 129 & n.226.  Numerous states—including Connecticut—have explicitly recognized a right to *equal* educational opportunity under their state constitutions.  *See Horton v. Meskill*, 376 A.2d 359, 375 (Conn. 1977) (holding that Connecticut's school-finance system violated the state's equal protection clause); Conn. Gen. Stat. § 10-4a; Conn. Const. art. VIII, § 1; *see also DuPree v. Alma Sch. Dist. No. 30,* 651 S.W.2d 90, 91 (Ark. 1983) (holding that Arkansas's system for school finance violated the state's equal protection clause); *Pauley v. Kelly*, 255 S.E.2d 859, 863 (W. Va. 1979) (holding that plaintiffs could proceed to trial on their state-based equity claim); *Washakie Cnty. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 315 (Wyo. 1980) (same); *Serrano v. Priest*, 487 P.2d 1241, 1244, 1249 n.11 (Cal. 1971) (finding that California's school finance system violated the state's equal protection clause); *Robinson v. Cahill*, 287 A.2d 187, 214 (N.J. Super. Ct. Law Div. 1972) ("The New Jersey system of financing public education denies equal protection rights guaranteed by the New Jersey and Federal Constitutions.").

128.     Thirty-one states have also held that their state constitutional provisions guarantee a right to a minimally *adequate* education. *See, e.g.*, *Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 253-54 (Conn. 2010); *Hull v. Albrecht*, 950 P.2d 1141, 1145 (Ariz. 1997) (en banc); *Lake View Sch. Dist. No. 25 v. Huckabee*, 91 S.W.3d 472, 492 (Ark. 2002); *Serrano v. Priest*, 557 P.2d 929, 951 (Cal. 1976); *Lobato v. State*, 218 P.3d 358, 374 (Colo. 2009) (en banc); *McDaniel v. Thomas*, 285 S.E.2d 156, 165 (Ga. 1981); *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 850 P.2d 724, 734-35 (Idaho 1993); *Montoy v. State*, 62 P.3d 228, 235 (Kan. 2003); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 205 (Ky. 1989); *Hancock v. Comm'r of Educ.*, 822 N.E.2d 1134, 1152 (Mass. 2005); *Skeen v. State*, 505 N.W.2d 299, 313-16 (Minn. 1993); *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 109 P.3d 257, 261 (Mont. 2005); *Claremont Sch. Dist. v. Governor*, 635 A.2d 1375, 1376 (N.H. 1993); *Abbott ex rel. Abbott v. Burke*, 693 A.2d 417, 428 (N.J. 1997); *Campaign for Fiscal Equity, Inc. v. State*, 655 N.E.2d 661, 665 (N.Y. 1995); *Leandro v. State*, 488 S.E.2d 249, 254 (N.C. 1997); *Bismarck Pub. Sch. Dist. No. 1 v. State*, 511 N.W.2d 247, 259 (N.D. 1994); *DeRolph v. State*, 677 N.E.2d 733, 737 (Ohio 1997); *Abbeville Cnty. Sch. Dist. v. State*, 515 S.E.2d 535, 540 (S.C. 1999); *Davis v. State*, 804 N.W.2d 618, 643-49 (S.D. 2011); *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 752-53 (Tex. 2005); *Brigham v. State*, 692 A.2d 384, 395 (Vt. 1997); *Scott v. Commonwealth*, 443 S.E.2d 138, 141-42 (Va. 1994); *Seattle Sch. Dist. No. 1 of King Cnty. v. State*, 585 P.2d 71, 85 (Wash. 1978); *Pauley*, 255 S.E.2d at 877-78; *Vincent v. Voight*, 614 N.W.2d 388, 411 (Wis. 2000); *Campbell Cnty. Sch. Dist. v. State*, 907 P.2d 1238, 1258-59 (Wyo. 1995); *Pendleton Sch. Dist. 16R v. State*, 200 P.3d 133, 144-45 (Or. 2009); *Guinn v. Legislature of Nev.*, 71 P.3d 1269, 1275 (Nev. 2003); *see also* Friedman & Solow, 81 Geo. Wash. L. Rev. at 129 n.227.

**3.      The Federal Government Has Played an Increasingly Prominent Role in Educational Funding and Policy over the Last Half Century**

129.    "[J]ust as the responsibility for education has shifted from local to state governments, it also has shifted in important ways to the federal government."  Friedman & Solow, 81 Geo. Wash. L. Rev. at 133; *see also* Kimberly Jenkins Robinson, *Resurrecting the Promise of* Brown*:  Understanding and Remedying How the Supreme Court Reconstitutionalized Segregated Schools*, 88 N.C. L. Rev. 787, 793 (2010) ("[T]he role of the federal government in public schools has risen to historic heights in recent years.").

130.    In 1965, Congress passed the Elementary and Secondary School Act ("ESEA"), which provided federal grants to every poor school district—that is, "Title I" districts—in America.  *See* Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. ch. 70).

131.    In 1979, the Department of Education gained Cabinet status.  *See* Department of Education Organization Act, Pub. L. No. 96-88, § 201, 93 Stat. 668, 671 (1979) (codified as amended at 20 U.S.C. § 3411).

132.    In 1994, Congress passed two pieces of legislation that dramatically expanded the federal government's role in education:  (a) the Goals 2000: Educate America Act (the "Goals 2000 Act") and (b) the Improving America's Schools Act ("IASA").  *See* Goals 2000: Educate America Act, Pub. L. No. 103-227, 108 Stat. 125 (1994) (codified as amended in scattered sections of 20 U.S.C.); Improving America's Schools Act of 1994, Pub. L. No. 103-382, 108 Stat. 3518 (codified as amended in scattered sections of 20 U.S.C.).

133.    The Goals 2000 Act articulated national content and performance standards for schools and schoolchildren and dedicated $440 million to helping states achieve those standards.  *See* Goals 2000: Educate America Act § 102 ("The Congress declares that the National

Education Goals [include] the following[:] . . . . [b]y the year 2000, all children in America will start school ready to learn[;] . . . [b]y the year 2000, the high school graduation rate will increase to at least 90 percent[[;] . . . [b]y the year 2000, all students will leave grades 4, 8, and 12 having demonstrated competency over challenging subject matter including English, mathematics, science, foreign languages, civics and government, economics, arts, history, and geography, and every school in America will ensure that all students learn to use their minds well, so they may be prepared for responsible citizenship, further learning, and productive employment in our Nation's modern economy."); *id.* § 303 (authorizing $400,000,000 in fiscal year 1994 for states who apply for federal funding to improve their standards); *see also* Friedman & Solow, 81 Geo. Wash. L. Rev. at 141-42.

134.    The IASA, for its part, created a mechanism through which the federal government could for the first time require that states develop educational standards, and hold states accountable in meeting them.  *See* Improving America's Schools Act of 1994, §§ 1111-1120B.  It did so by conditioning $10 billion in Title I funding on states' performance of a host of measures, including the development of "challenging" benchmarks for content and performance, the deployment of student assessments, and the creation of "plans" for taking corrective action in schools needing improvement.   *See id.* §§ 1111(a), 1111(b)(1)(A), 1111(b)(2)-(3), 1111(c)(1); Friedman & Solow, 81 Geo. Wash. L. Rev. at 141-43; Rosemary C. Salomone, Review, *The Common Schools Before and After Brown: Democracy, Equality and the Productivity Agenda*, 120 Yale L.J. 1454, 1477 (2011).

135.    In 2001, Congress expanded the federal government's role in education even further by enacting the No Child Left Behind Act.  No Child Left Behind conditioned Title I funding on states' development of "challenging academic content . . . and . . . student academic

achievement standards," and implementation of assessments.  *See* No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1425 (codified as amended in scattered sections of 20 U.S.C.).  No Child Left Behind required that assessments be given to all public-school students every year.  States also had to publish "plans" with the Department of Education spelling out in detail how they would work with localities and schools to ensure that by 2014, "all students . . . meet or exceed the State's proficient level of academic achievement."  No Child Left Behind Act of 2001 §§ 1111(b)(1), 1111(b)(2)(F).  The statute also required that there be a "highly qualified teacher[]" in every classroom.  *See id.* §§ 1114(b)(1)(C), 1115(c)(1)(E), 9101(23).  Finally, the statute required states to participate in National Assessment of Education Progress testing for 4th and 8th graders, which helped to establish a national metric to gauge academic progress.  *Id.* § 1111(b)(2).

136.    Passed overwhelmingly with bipartisan support, No Child Left Behind "demonstrates that by the turn of the century, a federal right to education had become an embedded public norm."  Friedman & Solow, 81 Geo. Wash. L. Rev. at 145; *see also* 147 Cong. Rec. 26,155 (2001) (House vote); *id.* at 26,635 (Senate vote).

137.    In 2009, Congress took it one step further, enacting the American Recovery and Reinvestment Act of 2009 and creating the federal Race to the Top program, "the largest competitive education grant program in U.S. History."  Race to the Top Fund, 74 Fed. Reg. 59,688 (Nov. 18, 2009); *see also* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 14006, 123 Stat. 115, 283-84.  Race to the Top provided a set of educational attainment and governance criteria that states had to meet to qualify for $4.35 billion in federal funding.  States that adopted new student-tracking methods, expanded access to charter schools, and adopted "common core standards"—a set of national achievement standards promulgated by a

joint effort of the Council of Chief State School Officers and the National Governors Association—had a higher chance of receiving a Race to the Top grant.  Largely as a result of Race to the Top, forty-two states have now signed on to the Common Core Standards.

138.    As these federal statutes demonstrate, the federal government has assumed an ever-increasing national commitment to provide an adequate and meaningful education to every child.

### 4.    Education Should Be Recognized as a Fundamental Right Under the U.S. Constitution

139.    "The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution."  *Obergefell*, 135 S. Ct. at 2598.  Fulfilling that duty "has not been reduced to any formula" but "requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." *Id.*

140.    It is difficult to conceive of an "interest[] of the person" more "fundamental" and deserving of the State's "respect" than education.  Education plays a critical role in breaking down barriers and enabling personal and professional success; it also embodies the American commitment to equality of opportunity and provides the best hope to give every child— regardless of race or socioeconomic background—a chance at the American dream.  *See Ambach*, 441 U.S. at 76-78 ("The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests, long has been recognized").  But just as equal access to quality education can level the playing field, unequal access to high-quality education can perpetuate inequality for generations.  *See Plyler*, 457 U.S. at 221-23 ("We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order

rests."). Indeed, in today's global economy, far more than in 1954 when the Court decided *Brown*, "it is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education." *Brown*, 374 U.S. at 493.

141.   In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), the Supreme Court upheld Texas's school financing system after determining that there was no "right to education explicitly or implicitly guaranteed by the Constitution" under the equal protection clause. *Id.* at 33; *see also id.* at 29-40. *Rodriguez*, however, was careful to preserve the possibility of a constitutional violation where there is an "absolute denial of educational opportunities"—i.e., where "the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id.* at 37. Since *Rodriguez*, the Court has also made clear that it "has not yet definitively settled . . . whether a minimally *adequate* education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review." *Papasan v. Allain*, 478 U.S. 265, 285 (1986) (emphasis added). And, whatever *Rodriguez* might have said about the existence of a fundamental right to education in 1973, the Court has dramatically altered its fundamental rights jurisprudence in the forty-plus years since *Rodriguez*. Under the Supreme Court's modern jurisprudence, education is a fundamental right under the federal constitution.

142.   Indeed, in *Washington v. Glucksberg*, 521 U.S. 702 (1997), the Court set forth a new test for identifying unenumerated fundamental rights:  to receive higher scrutiny under *Glucksberg*, rights and liberties must be (1) "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed"; and (2) susceptible to "careful description." *Glucksberg*, 521 U.S. at 720-

21.    Since then, the Supreme Court has recognized several fundamental rights under the *Glucksberg* test.   *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003) (holding that consenting same-sex adults have a fundamental right to engage in sexual intimacy); *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 269-87 (1990) (acknowledging that patients in a "persistent vegetative state" have a fundamental right to refuse medical treatment).

143.    Most recently, in *Obergefell*, 135 S. Ct. 2584, the Court refined the fundamental-rights inquiry again, holding that "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries," and that fundamental rights should not be "defined in a most circumscribed manner, with central reference to specific historical practices." *Id.* at 2598, 2602; *see also id.* at 2598 (describing a standard that "respects our history and learns from it without allowing the past alone to rule the present").

144.    Since the Founding Era, the federal government has consistently recognized that education is critically important to individual liberty and autonomy, and to our democratic system as a whole.  As "Thomas Jefferson pointed out early in our history, . . . some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence," and "education prepares individuals to be self-reliant and self-sufficient participants in society." *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972).

145.    The importance of education in every state—all of which compel attendance and the majority of which recognize education as a fundamental right—confirms its fundamental quality.  Just as with marriage, "[t]he States have contributed to the fundamental character of the [education] right by placing that institution at the center of so many facets of the legal and social order." *Obergefell*, 135 S. Ct. at 2601.  Also like marriage, "[c]hoices about [education] shape

an individual's destiny." *Obergefell*, 135 S. Ct. at 2599; *Board of Ed. v. Allen*, 392 U.S. 236, 247 (1968) (Americans "have considered high quality education to be an indispensable ingredient for achieving the kind of nation, and the kind of citizenry, that they have desired to create.").

146.    Education has long been essential to autonomy and dignity in American society as well, and "has a fundamental role in maintaining the fabric of our society." *Plyler*, 457 U.S. at 221-23.  It is the cornerstone of social, economic, intellectual, and psychological well-being, and of civic and political empowerment and responsibility. *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted.").  Indeed, the Supreme Court has said that the "right to marry . . . draws meaning from related rights of childrearing, procreation and *education*," all of which are a "central part" of "the liberty protected by the Due Process Clause." *Obergefell*, 135 S. Ct. at 2600 (citing *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)) (emphasis added).

147.    Since the Supreme Court issued *Rodriguez* more than forty years ago, the scope of the fundamental right to education, as well as the means by which to identify violations of that right, are now far more capable of definition and identification than they once were.  Indeed, in *Rodriguez*, the Court emphasized that it had reached its decision, at least in part, due to the Court's belief that it could not determine, as a practical matter, whether there had been a deprivation of plaintiffs' rights.  *Rodriguez*, 411 U.S. at 36-37 ("[I]f it were conceded that . . . education is . . . constitutionally protected . . . we have no indication that the present levels of educational expenditures in Texas provide an education that falls short.").  By contrast, Connecticut now implements widely-accepted measures of educational outcomes, including but

not limited to the Connecticut Mastery Test, Connecticut Academic Performance Test, Modified Assessment System, Skills Checklist, Smarter Balanced Assessments, and Next Generation Accountability System.  So, too, does the federal government.  *See, e.g.,* Race to the Top Fund, 74 Fed. Reg. 59,688 (Nov. 18, 2009).  Thus, the practical difficulties described in *Rodriguez* regarding whether and how to identify constitutional violations no longer exist, to the extent they ever did.

148.     In short, education has deep roots in our nation's history as a critically important state function, has been consistently offered and regulated by states and the federal government, is susceptible to careful definition and description, and "'prepares individuals to be self-reliant and self-sufficient participants in society.'"  *Yoder*, 406 U.S. at 221.  Under *Glucksberg* and *Obergefell*, both equality of educational opportunity and access to a minimally adequate education should—indeed, must—be recognized as fundamental rights.

## CLAIMS FOR RELIEF

### CLAIM ONE:  EQUAL PROTECTION

### (EQUALITY OF EDUCATIONAL OPPORTUNITY)

149.     Plaintiffs hereby incorporate by reference paragraphs 1 through 148, *supra*, as if fully set forth herein.

150.     The Anti-Opportunity Laws violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (U.S. Const., amend. XIV, § 1).

151.     The Equal Protection Clause ensures a federal constitutional right to substantial equality of educational opportunity.

152.     To the extent that *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), is inconsistent with this principle, it should be overruled.  The *Rodriguez* case— decided more than forty years ago—predated the tests for identifying unenumerated fundamental

rights set forth in *Glucksberg*, 521 U.S. 702, *Lawrence*, 539 U.S. 558, and *Obergefell*, 135 S. Ct. 2584.   As alleged above, the right to substantially equal educational opportunity satisfies the Supreme Court's most recent articulation of the fundamental rights test:   the importance of public education is deeply rooted in our nation's history and traditions, and the parameters of a right to substantially equal educational opportunity can be clearly defined.

153.   The fundamental right to substantially equal educational opportunity is also consistent with the Supreme Court's equal protection jurisprudence regarding animus and indifference towards minorities.   *See Brown*, 347 U.S. 483; *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985); *Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973); *Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence*, 539 U.S. 558; *United States v. Windsor*, 133 S. Ct. 2675 (2013); *Obergefell*, 135 S. Ct. 2584.   Where the State knows full well that certain of its schools are providing poor and minority communities with inferior and woefully inadequate educational opportunities, and where it knows the achievement gap has persisted for decades, the State cannot, consistent with the Equal Protection Clause, intentionally inhibit viable, superior alternatives to those schools.

154.   The Anti-Opportunity Laws, both individually and collectively, violate students' fundamental right to substantial equality of educational opportunity under the Fourteenth Amendment's Equal Protection Clause.

155.   Connecticut's moratorium on inter-district magnet schools (Conn. Gen. Stat. § 10-264*l*(b)(1); Public Act No. 09-6, § 22 (Spec. Sess.); Public Act No. 15-177, § 1) violates the Fourteenth Amendment's Equal Protection Clause because it deprives poor and minority children in Connecticut of educational opportunities available to their wealthier and predominantly white peers.

156.    Connecticut's statutes governing the method of funding and approval of charter schools (Conn. Gen. Stat. §§ 10-66ee(c)-(d), 10-66bb(a), 10-66bb(g))—which deter the creation and expansion of charter schools and create an effective cap on charter schools—violate the Fourteenth Amendment's Equal Protection Clause because they deprive poor and minority children in Connecticut of educational opportunities available to their wealthier and predominately white peers.

157.    Connecticut's effective cap on Open Choice enrollment (Conn. Gen. Stat. §§ 10-266aa(c), 10-266aa(e), 10-266aa(f), 10-266aa(g), 10-266aa(h)) violates the Fourteenth Amendment's Equal Protection Clause because it deprives poor and minority children in Connecticut of educational opportunities available to their wealthier and predominately white peers.

158.    Connecticut has no possible justification for knowingly subjecting these children to such unequal and unfair treatment.  Where—as here—the State knows that it is not providing, and cannot provide, substantially equal educational opportunities to inner-city children, then it must not obstreperously stand in the way of feasible options that would significantly improve the quality of their lives.

159.    Because the Anti-Opportunity Laws unjustifiably and knowingly burden poor and minority students' fundamental right to substantial equality of educational opportunity, and do so unequally relative to their wealthier and white peers, this Court should grant declaratory relief stating that the Anti-Opportunity Laws are unconstitutional both on their face and as applied to Plaintiffs.  By forcing students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives, Connecticut is violating students' federal equal protection rights.  Further, this Court should enjoin enforcement

of the Anti-Opportunity Laws to the extent they force Connecticut students, including Plaintiffs, to attend failing public schools.

## CLAIM TWO:  EQUAL PROTECTION

## (FUNDAMENTAL RIGHT TO A MINIMALLY ADEQUATE EDUCATION)

160.    Plaintiffs hereby incorporate by reference paragraphs 1 through 159, *supra*, as if fully set forth herein.

161.    The Anti-Opportunity Laws violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (U.S. Const., amend. XIV, § 1).

162.    "The Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles."  *Obergefell*, 135 S. Ct. at 2602-03.  "Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other."  *Id.* at 2603.  "In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right . . . . Each concept—liberty and equal protection—leads to a stronger understanding of the other."  *Id.*  Indeed, "in interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged."  *Id.*

163.    As the Supreme Court stated in *Papasan*, 478 U.S. at 285-86, thirteen years after *Rodriguez*:  the Supreme Court "has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review."  *See also Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 466 n.1 (1988) (Marshall, J., dissenting)

(noting that the Court did not "address the question whether a State constitutionally could deny a child access to a minimally adequate education" and that the "question remains open today").

164.     When considering the scope of certain other rights under the Equal Protection Clause, the Supreme Court has held that a state that voluntarily assumes an obligation to provide its citizens with a right must ensure that *all* of its citizens can exercise that right in a meaningful and minimally adequate manner.  *See, e.g.*, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[I]t is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."); *Bullock*, 405 U.S. at 148 (applying similar rationale to voting rights); *Bush v. Gore*, 531 U.S. 98, 104 (2001) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").  Just as with voting, once a state decides to provide a public education system and compel students to attend school, it must provide a meaningful and minimally adequate education to all students statewide.

165.     Connecticut's Anti-Opportunity Laws violate the federal Equal Protection Clause because they knowingly deprive certain Connecticut students of their fundamental right to a minimally adequate education.

166.     Connecticut's moratorium on inter-district magnet schools (Conn. Gen. Stat. § 10-264*l*(b)(1); Public Act No. 09-6, § 22 (Spec. Sess.); Public Act No. 15-177, § 1) violates the Fourteenth Amendment's Equal Protection Clause because it knowingly restricts the supply of high-performing schools available to students, forcing them to attend low-performing traditional district schools while languishing on magnet-school waitlists.

167.    Connecticut's statutes governing the method of funding and approval of charter schools (Conn. Gen. Stat. §§ 10-66ee(c)-(d), 10-66bb(a), 10-66bb(g))—which deter the creation and expansion of charter schools and create an effective cap on charter schools—violate the Fourteenth Amendment's Equal Protection Clause because they knowingly restrict the supply of high-performing schools available to students, forcing them to attend low-performing traditional district schools while languishing on charter-school waitlists.

168.    Connecticut's effective cap on Open Choice enrollment (Conn. Gen. Stat. §§ 10-266aa(c), 10-266aa(e), 10-266aa(f), 10-266aa(g), 10-266aa(h)) violates the Fourteenth Amendment's Equal Protection Clause because it knowingly restricts the supply of high-performing schools available to students, forcing them to attend low-performing traditional district schools while languishing on Open Choice waitlists.

169.    Connecticut has no possible justification for intentionally subjecting children to such unequal and unfair treatment.  Where—as here—the State knows that it is not providing, and cannot provide, a meaningful education to thousands of children, then it must not stand in the way of feasible options that would significantly improve the quality of their lives.

170.    Because the Anti-Opportunity Laws unjustifiably and knowingly burden poor and minority students' fundamental right to a minimally adequate education, this Court should grant declaratory relief stating that the Anti-Opportunity Laws are unconstitutional both on their face and as applied to Plaintiffs.  By forcing students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives, Connecticut is violating students' federal equal protection rights.  Further, this Court should enjoin enforcement of the Anti-Opportunity Laws to the extent they force Connecticut students, including Plaintiffs, to attend failing public schools.

## CLAIM THREE:  EQUAL PROTECTION

## (DEPRIVATION OF EQUALITY INTEREST)

171.    Plaintiffs hereby incorporate by reference paragraphs 1 through 170, *supra*, as if fully set forth herein.

172.    Even in the absence of a fundamental right to education, the Anti-Opportunity Laws violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (U.S. Const., amend. XIV, § 1).

173.    "[D]enial of education to [an] isolated group of children poses an affront to one of the goals of the Equal Protection Clause:  the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit."  *Plyler*, 457 U.S. at 221-22.

174.    The Anti-Opportunity Laws present unreasonable obstacles to advancement on the basis of individual merit and deprive certain Connecticut students zoned for failing traditional public schools—such as the Plaintiffs here—of an "equal opportunity" to access the same quality public education that is available to other students in the State.  *See Plyler*, 457 U.S. at 223; *Gray v. Sanders*, 372 U.S. 368, 379-80 (1963); *Harper*, 383 U.S. at 670 (requiring "the opportunity for equal participation by all voters in the election of state legislators") (citation omitted).

175.    By knowingly obstructing these children from escaping a vastly inferior education, the Anti-Opportunity Laws "impose[] a lifetime hardship on a discrete class of children not accountable for their disabling status" and inflict a "stigma of illiteracy [that] will mark them for the rest of their lives."  *Plyler*, 457 U.S. at 223; *see also Obergefell*, 135 S. Ct. at 2602 (invalidating laws "impos[ing] stigma and injury of the kind prohibited by our basic

charter").  The Anti-Opportunity Laws "abridge central precepts of equality" and "inflict substantial and continuing harm," *Obergefell*, 135 S. Ct. at 2604, 2607, on poor and minority children zoned for chronically failing traditional public schools.

176.  The State does not and cannot possibly have a legitimate purpose for knowingly relegating these children to second-class citizenship and stigmatizing them "for the rest of time." *Obergefell*, 135 S. Ct. at 2594-95.  The Anti-Opportunity Laws' "costs to the Nation and to the innocent children who are [their] victims" demonstrate the laws' irrationality and that they do not further a legitimate—let alone a substantial—state interest.  *See Plyler*, 457 U.S. at 223-24.

177.  Because the Anti-Opportunity Laws unjustifiably and knowingly burden students' equality rights under the Fourteenth Amendment, this Court should grant declaratory relief stating that the Anti-Opportunity Laws are unconstitutional both on their face and as applied to Plaintiffs.  By forcing students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives, Connecticut is violating students' federal equal protection rights.  Further, this Court should enjoin enforcement of the Anti-Opportunity Laws to the extent they force Connecticut students, including Plaintiffs, to attend failing public schools.

## CLAIM FOUR: DUE PROCESS

## (FUNDAMENTAL RIGHT TO A MINIMALLY ADEQUATE EDUCATION)

178.  Plaintiffs hereby incorporate by reference paragraphs 1 through 177, *supra*, as if fully set forth herein.

179.  The Anti-Opportunity Laws violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (U.S. Const., amend. XIV, § 1).

180.    "The Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles." *Obergefell*, 135 S. Ct. at 2602-03. "Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other." *Id.* at 2603. "In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right . . . . Each concept—liberty and equal protection—leads to a stronger understanding of the other." *Id.* Indeed, "in interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Id.*

181.    The Due Process Clause of the Fourteenth Amendment guarantees all citizens a fundamental right to a minimally adequate education. *See Meyer*, 262 U.S. at 400 ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted"); *see also Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965).

182.    Connecticut's Anti-Opportunity Laws violate the federal Due Process Clause because they knowingly deprive certain Connecticut students of their fundamental right to a minimally adequate education.

183.    Connecticut's moratorium on inter-district magnet schools (Conn. Gen. Stat. § 10-264*l*(b)(1); Public Act No. 09-6, § 22 (Spec. Sess.); Public Act No. 15-177, § 1) violates the federal Due Process Clause because it knowingly restricts the supply of high-performing schools

available to students, forcing them to attend low-performing traditional district schools while languishing on magnet-school waitlists.

184.    Connecticut's statutes governing the method of funding and approval of charter schools (Conn. Gen. Stat. §§ 10-66ee(c)-(d), 10-66bb(a), 10-66bb(g))—which deter the creation and expansion of charter schools and create an effective cap on charter schools—violate the federal Due Process Clause because they knowingly restrict the supply of high-performing schools available to students, forcing them to attend low-performing traditional district schools while languishing on charter-school waitlists.

185.    Connecticut's effective cap on Open Choice enrollment (Conn. Gen. Stat. §§ 10-266aa(c), 10-266aa(e), 10-266aa(f), 10-266aa(g), 10-266aa(h)) violates the federal Due Process Clause because it knowingly restricts the supply of high-performing schools available to students, forcing them to attend low-performing traditional district schools while languishing on Open Choice waitlists.

186.    Connecticut has no possible justification for knowingly subjecting children to such unequal and unfair treatment.  Where—as here—the State knows that it is not providing, and cannot provide, a meaningful education to inner-city children, then it must not stand in the way of feasible options that would significantly improve the quality of their lives.

187.    Because the Anti-Opportunity Laws unjustifiably and knowingly burden poor and minority students' fundamental right to a minimally adequate education, this Court should grant declaratory relief stating that the Anti-Opportunity Laws are unconstitutional both on their face and as applied to Plaintiffs.  By forcing students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives, Connecticut is violating students' federal due process rights.  Further, this Court should enjoin enforcement of

the Anti-Opportunity Laws to the extent they force Connecticut students, including Plaintiffs, to attend failing public schools.

## CLAIM FIVE: DUE PROCESS

## (DEPRIVATION OF LIBERTY INTEREST)

188.    Plaintiffs hereby incorporate by reference paragraphs 1 through 187, *supra*, as if fully set forth herein.

189.    Even in the absence of a fundamental right to education, Connecticut's Anti-Opportunity Laws violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution (U.S. Const., amend. XIV, § 1), both on their face and as-applied to Plaintiffs, because they knowingly infringe on children's fundamental liberty and punish children for something beyond their control—namely their residential address and/or parental wealth. *See Plyler*, 457 U.S. 202 (holding that children of illegal immigrants cannot be punished for their parents' conduct by depriving them of access to public K-12 education); *St. Ann v. Palisi*, 495 F.2d 423 (5th Cir. 1974) (holding that laws that deprive children of an education as a result of things that are beyond their control—e.g., the conduct of their parents—are subject to heightened scrutiny under the Due Process Clause because they implicate the liberty interest to be punished only for "personal guilt").

190.    Because the Anti-Opportunity Laws are a "significant encroachment upon a basic element of due process, the state, in order to justify this encroachment, must satisfy a substantial burden." *St. Ann*, 495 F.2d at 427.  The State has no possible legitimate, much less substantial, justification for knowingly depriving children of their liberty based on traits beyond their control. Where—as here—the State knows it is not providing, and cannot provide, a meaningful education to inner-city children, then it must not actively and knowingly punish those children

for traits outside their control and deprive them of their basic liberty interests by standing in the way of feasible educational options that would significantly improve the quality of their lives.

191.    The Anti-Opportunity Laws unjustifiably and knowingly punish children for conduct beyond their control and deprive them of their liberty.  By imposing a moratorium on new inter-district magnet schools (Conn. Gen. Stat. § 10-264*l*(b)(1); Public Act No. 09-6, § 22 (Spec. Sess.); Public Act No. 15-177, § 1), preventing high-performing charter schools from opening or expanding their presence in Connecticut (Conn. Gen. Stat. §§ 10-66ee(c)-(d), 10-66bb(a), 10-66bb(g)), and funding Open Choice programs in a manner that disincentivizes participation (Conn. Gen. Stat. §§ 10-266aa(c), 10-266aa(e), 10-266aa(f), 10-266aa(g), 10-266aa(h)), the Anti-Opportunity Laws make it all but certain that children zoned for failing traditional district schools will have no alternatives and will be forced to attend those schools. This punishes students—like the Plaintiffs here—based on their parents' inability to live in a wealthier neighborhood with better traditional public schools and their inability to afford private school alternatives.

192.    Because the Anti-Opportunity Laws unfairly punish low-income and minority students for their parents' residential address and wealth, and deprive these children of their liberty, this Court should grant declaratory relief stating that the Anti-Opportunity Laws are unconstitutional both on their face and as applied to Plaintiffs.  By forcing students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives, Connecticut is violating students' federal due process rights.  Further, this Court should enjoin enforcement of the Anti-Opportunity Laws to the extent they force Connecticut students, including Plaintiffs, to attend failing public schools.

## CLAIM SIX:  DUE PROCESS AND EQUAL PROTECTION

## (DUTY OF PUBLIC ADMINISTRATION)

193.    Plaintiffs hereby incorporate by reference paragraphs 1 through 192, *supra*, as if fully set forth herein.

194.    Even in the absence of a fundamental right to education, Connecticut is violating the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution (U.S. Const., amend. XIV, § 1) because Connecticut is failing to fulfill its duty of public administration.

195.    Pursuant to its duty of public administration, Connecticut has a continuing "duty to examine rigorously the effects of [its] conduct on civil rights values," including education. Charles Sabel and William H. Simon, *The Duty of Responsible Administration and the Problem of Police Accountability*, 33 Yale J. on Reg. 165, 201 (2016); see also Rebecca Yergin, *Rethinking Public Education Litigation Strategy:  A Duty-Based Approach to Reform*, 115 Columbia L.J. 1563, 1595-96 (2015).  This constitutional duty of public administration requires Connecticut to "induce [any] entities that have violated constitutional norms to undertake disciplined self-analysis of the extent and underlying causes of the harms they have caused," and—using the information and data within its reach—to revise the policies and laws that have produced those harms.  *See* Sabel & Simon, 33 Yale J. on Reg. at 210; Yergin, 115 Columbia L.J. at 1156, 1158, 1601.

196.    As demonstrated by the statewide academic performance index that Connecticut itself implements, Connecticut is well aware of the educational inequities and inadequate educational opportunities that exist in many failing traditional district schools within its borders.

197.    Connecticut is also well aware that viable educational alternatives exist, including Connecticut's public magnet schools, public charter schools, and high-performing traditional district schools—schools that routinely and substantially outperform the failing traditional district schools that Connecticut compels its students to attend.

198.    In spite of this knowledge, Connecticut has failed to take well-known and reasonably available steps to moderate these disastrous educational disparities and inadequacies. To the contrary, the State knowingly has erected barriers that foreclose meaningful educational opportunities for tens of thousands of students on a daily basis.

199.    Connecticut's knowing abdication of its duty to safeguard the civil rights of its citizens constitutes a violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.   This Court should enter declaratory and injunctive relief requiring Connecticut to ensure that no Connecticut students, including Plaintiffs, are forced to attend failing public schools.

## CLAIM SEVEN:  VIOLATION OF 42 U.S.C. § 1983

200.    Plaintiffs hereby incorporate by reference paragraphs 1 through 199, *supra*, as if fully set forth herein.

201.    Insofar as they are enforcing the Anti-Opportunity Laws, Defendants, acting under color of state law, are depriving and will continue to deprive Plaintiffs and thousands of other Connecticut students of numerous rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## CLAIM EIGHT:  DECLARATORY RELIEF

202.    Plaintiffs hereby incorporate by reference paragraphs 1 through 201, *supra*, as if fully set forth herein.

203.    An actual and justiciable controversy exists between Plaintiffs and Defendants because Plaintiffs contend, and Defendants dispute, that Defendants' actions and inactions as described above have violated the constitutional provisions cited herein.

204.    Plaintiffs seek a declaration that the Anti-Opportunity Laws are unconstitutional both on their face and as applied to Plaintiffs.  Specifically, by forcing students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives, Connecticut is violating students' federal equal protection and due process rights.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Plaintiffs respectfully request that, pursuant to 28 U.S.C. § 2201, this Court enter a declaratory judgment stating that the Anti-Opportunity Laws are unconstitutional, both on their face and as applied to Plaintiffs.

2.    Plaintiffs respectfully request that, pursuant to 28 U.S.C. § 2201, this Court enter a declaratory judgment stating that Connecticut is violating Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and 42 U.S.C. § 1983 by forcing them and thousands of other students to attend public schools that it *knows* are failing, while simultaneously impeding the availability of viable educational alternatives by implementing and enforcing the Anti-Opportunity Laws.

3. Plaintiffs respectfully request that this Court enter a permanent injunction requiring Connecticut to stop enforcing the Anti-Opportunity Laws to the extent those laws force Connecticut students, including Plaintiffs, to attend failing public schools.

4. Plaintiffs respectfully request that this Court retain continuing jurisdiction over this matter until such time as the Court has determined that Defendants have fully and properly complied with its Orders.

5. Plaintiffs respectfully requests costs of suit, including reasonable attorneys' fees under 42 U.S.C. § 1988, and all further relief to which they may be justified.

Respectfully submitted,

Dated: August 23, 2016          */s/ Kevin M. Smith*                         

Theodore J. Boutrous, Jr., *pro hac vice* pending
Marcellus A. McRae, *pro hac vice* pending
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone:          213.229.7804
Facsimile:          213.229.6804

Joshua S. Lipshutz, *pro hac vice* pending
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:          202.955.8217
Facsimile:          202.530.9614

Kevin M. Smith (Connecticut Bar No. 24774)
WIGGIN AND SMITH LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Telephone:          203.498.4579
Facsimile:          203.782.2889

Attorneys for Plaintiffs JESSICA MARTINEZ, on behalf of herself and her minor son JOSE MARTINEZ, DAHLIA BRYAN, on behalf of herself and her minor children JORR MOORLEY, CURTIS MOORLEY, ALEC PATTERSON, and JAIDYN BRYAN, LESLIE RODRIGUEZ, on behalf of herself and her minor granddaughter NINA MARTINEZ, and FRANKIE FRANCES, on behalf of himself and his minor son, DYLON FRANCES