### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------- x
JESSICA MARTINEZ, on behalf of   :
herself and her minor son, JOSE  :
MARTINEZ, DAHLIA BRYAN, on       :
behalf of herself and her minor  :
children, JORR MOORLEY, CURTIS   :
MOORLEY, ALEC PATTERSON and      :
JAIDYN BRYAN, LESLIE RODRIGUEZ,  :
on behalf of herself and her     :
minor granddaughter, NINA        :
MARTINEZ, and FRANKIE FRANCES,   :
on behalf of himself and his     :
minor son, DYLON FRANCES,        :
                                 :
          Plaintiffs,            :
                                 :
v.                               :   Civil No. 3:16-cv-1439(AWT)
                                 :
DANNEL P. MALLOY, in his         :
official capacity as Governor of :
Connecticut, DIANNA WENTZELL, in :
her official capacity as         :
Commissioner of Education, KEVIN :
LEMBO, in his official capacity  :
as State Comptroller, DENISE     :
NAPPIER, in her official         :
capacity as State Treasurer, and :
DENISE W. MERRILL, in her        :
official capacity as Secretary   :
of State,                        :
                                 :
          Defendants.            :
------------------------------- x
```

### RULING ON MOTION TO DISMISS

Defendants Dannel Malloy, in his official capacity as Governor of Connecticut, Diana Wentzell, in her official capacity as Commissioner of Education, Kevin Lembo, in his official capacity as State Comptroller, Denise Nappier, in her

official capacity as State Treasurer, and Denise W. Merrill, in her official capacity as Secretary of State, move to dismiss the plaintiffs' complaint. The defendants argue that the plaintiffs lack standing, that the plaintiffs' suit is barred by the Eleventh Amendment, and that the statutes at issue should be subject to rational basis scrutiny, which they survive. For the reasons set forth below, Defendants' Motion to Dismiss Plaintiffs' Complaint is being granted, except as to Claim Six, but the defendants are hereby granted leave to file a supplemental motion to dismiss as to that claim.

## I.  FACTUAL ALLEGATIONS

The plaintiffs allege that, for decades, Connecticut public schools have failed to provide a minimally adequate education to inner-city students. The plaintiffs allege that Connecticut compels thousands of schoolchildren to attend "severely underperforming schools," Compl. ¶ 30, citing data indicating that inner-city schools, in particular, perform far below state targets for academic performance. The plaintiffs allege that their experiences at their respective schools "exemplify [the] pervasive chronic failure" reflected in the data. Compl. ¶ 37. They refer to data on each school showing that each of their schools is underperforming.

The plaintiffs allege that in contrast to its inner-city schools, Connecticut's schools serving white and non-low-income student populations "generally perform quite well academically." Compl. ¶ 45. They further allege that the achievement gap is one of the worst in the country, with minority students falling several grades behind more affluent, white students. The achievement gap results in "deeply lopsided" graduation rates, students being poorly prepared for college, and much lower median incomes. Compl. ¶ 47. The plaintiffs allege that the State knows that its underperforming public schools "simply do not provide students with the necessary tools to succeed academically or to become productive members of society." Compl. ¶ 30.

As an alternative to traditional public schools, Connecticut maintains a system of magnet and charter schools, and operates a program that allows students to attend higher-performing traditional public schools in other districts on a space-available basis. The plaintiffs allege that magnet and charter schools and the school choice program allow students to attend higher-performing schools. Despite the existence of these options, the State of Connecticut "has taken steps that prevent these poor and minority children from having viable public-school alternatives." Compl. ¶ 3. The plaintiffs allege that the status quo is a "'state-imposed' system of discrimination

that deprives low-income and minority schoolchildren "of the vital educational opportunities available to their more affluent and predominantly white peers."  Compl. ¶ 30.

The plaintiffs allege that "[t]he inexcusable educational inequity and inadequacy in Connecticut is, in substantial part, the result of state laws and policies."  Compl. ¶ 30.  The plaintiffs challenge three specific state laws and policies in this lawsuit: (1) the moratorium on new magnet schools; (2) the "dysfunctional" state laws that govern public charter schools; and (3) the state's inter-district Open Choice enrollment program, which they define as the "Anti-Opportunity Laws".

### A. Magnet School Moratorium

The plaintiffs allege that the most common type of magnet school is a "full-time inter-district magnet school," which is "a publicly funded school designed to promote racial, ethnic, and economic diversity that draws students from more than one school district and offers a special or high-quality curriculum."  Compl. ¶ 51.  The plaintiffs allege that the State Department of Education completed a study that indicates that "inter-district magnet schools are a superior alternative to its traditional district schools."  Compl. ¶ 55.  Also, the plaintiffs allege that magnet schools serving predominantly low-income and minority student populations have had remarkable

success in maintaining high student performance -- sometimes even higher than the state average. The plaintiffs allege that the State knows that "inter-district magnet schools are a superior alternative to its traditional district schools that are failing to provide thousands of children with a minimally adequate education."  Compl. ¶ 55.

In this lawsuit, the plaintiffs challenge the constitutionality of Public Act 09-6, a law passed in 2009, which imposed a moratorium "prohibit[ing] the construction of new inter-district magnet schools," until the Connecticut Commissioner of Education "assesses magnet schools' performance and develops a comprehensive statewide magnet school plan." Compl. ¶ 83.  The plaintiffs allege that the Commissioner of Education has not yet submitted her plan, and that the moratorium remains in place.  Compl. ¶ 84.  As a result, new magnet schools have not been able to open in this state.  The plaintiffs allege that because magnet schools have a "proven track record of success" and seats at each school are in very high demand, the state's decision to impose a moratorium on the opening of new magnet schools "intentionally impede[s] the availability of such superior alternatives [to traditional district schools] and [compels] students to attend failing traditional district schools that it knows are hurting low-income and minority school children."  Compl. ¶ 82.

### B. Charter School Funding Scheme

The plaintiffs allege that a charter school is "a public,
nonsectarian school that is established under a charter,
organized as a nonprofit entity, and operated independently of
any local or regional board of education."  Compl. ¶ 62.  The
plaintiffs allege that, "[f]or the 2015-16 school year, 85% of
students enrolled in Connecticut charter schools were African-
American or Hispanic and 70% were low-income."  Compl. ¶ 64.
The plaintiffs allege that the State has recognized that "city
resident students" who attend charter schools perform measurably
better -- and achieve at or above proficiency -- in reading and
mathematics than city resident students attending traditional
public schools, and that the State "knows that charter schools
offer poor and minority students superior educational
opportunities as compared to failing traditional district
schools."  Compl. ¶ 65.  The plaintiffs cite to studies
demonstrating that students in charter schools often outperform
students in traditional public schools in the same district.

The plaintiffs challenge the constitutionality of the way
charter schools are funded.  The plaintiffs allege that
Connecticut "effectively caps the ability of charter school
operators to open new schools and to maintain or expand existing
schools in the State."  Compl. ¶ 88.  The State "effectively
caps" charter school funding by forcing them to "depend on the

shifting whims of the General Assembly to provide them with the support necessary to keep their doors open." Compl. ¶ 88. Specifically, the plaintiffs allege that "the General Assembly must decide whether or not to appropriate funding to charter schools," and some payment installments over the course of the school year are subject to adjustment or are only paid out if the State has sufficient funds. Compl. ¶ 91. The plaintiffs further allege that even if a new charter school obtains a charter from the State Board of Education, it is uncertain whether the General Assembly will appropriate funds for the school.

The plaintiffs allege that Connecticut's approach to funding charter schools disincentivizes charter school operators from trying to open new charter schools in the state. To illustrate this assertion, the plaintiffs allege that national charter school networks, such as the Knowledge is Power Program and Uncommon Ground, operate dozens of schools in surrounding states, but zero in Connecticut. As a result, "Connecticut has far fewer charter schools per student than other states," and "thousands of students are stuck on charter-school waitlists, trying to gain admission and escape the failing traditional schools they would otherwise be forced to attend." Compl. ¶ 98. Although charter schools provide "significant potential to help inner-city low-income and minority students . . . close the

achievement gap," the State's approach to funding the schools,
the plaintiffs allege, in reality, "actively prevents
[Connecticut] students from obtaining a meaningful education."
Compl. ¶ 99.

### C. Open Choice Program Funding Scheme

The plaintiffs allege that Connecticut's Open Choice
program was created to "(1) [i]mprove academic achievement; (2)
reduce racial, ethnic and economic isolation or preserve racial
and ethnic balance; and (3) provide a choice of educational
programs."  Compl. ¶ 76.  The program "allow[s] students to
attend traditional district schools in other districts on a
space-available basis."  The plaintiffs allege that access to
high-quality public schools through the Open Choice program
provides Connecticut schoolchildren an alternative to
"chronically failing traditional schools in the plaintiffs'
districts."  Compl. ¶ 81.

The plaintiffs claim that the way the Open Choice program
is funded "has built-in disincentives that effectively cap the
number of students that recipient schools may accept."  Compl. ¶
101.  The plaintiffs allege that the Open Choice program is
funded through the State's Education Cost Sharing grant formula,
which determines how much a state will contribute to local
school districts for all education expenditures on a per pupil

basis.  For the Open Choice program, however, the receiving districts are only permitted to count one-half of each Open Choice student when reporting to the State the number of pupils in their districts.  The plaintiffs allege that this imposes an additional financial burden on school districts accepting Open Choice students, which "causes far too few school districts to open up far too few seats for students in need."  Compl. ¶ 104. The plaintiffs allege that less than one percent of public school students in Connecticut participate in the Open Choice programs, and that the waitlists for students are "staggering." Compl. ¶ 107.  Consequently, the State is "knowingly leav[ing] thousands of Connecticut's most vulnerable students languishing in chronically-failing schools."  Compl. ¶ 109.

### D. Parties

The plaintiffs in this case are Connecticut students and parents.  Plaintiffs Jose Martinez, Jorr Morley, Alec Patterson, Nina Martinez, and Dylan Frances are students enrolled in low-performing traditional public schools in Bridgeport and Hartford.  Plaintiffs Jessica Martinez, Dahlia Bryan, Leslie Rodriguez, and Frankie Frances are parents of the plaintiff-students.  The plaintiffs allege that the plaintiff-parents have applied on behalf of their children to high-performing magnet and charter schools, but their children were denied admission because of lack of capacity. The plaintiffs allege that the

plaintiff-parents will apply on the students' behalf for admission to high-performing magnet and charter high schools and/or apply for an inter-district transfer to higher-performing traditional public schools in the future, however, the challenged laws and policies "are likely to prevent [the students] from gaining admission to any such schools."  Compl. ¶¶ 11, 13, 15, 16, 18, 20.

Plaintiff Curtis Morley was recently accepted into a high-performing public charter school, but alleges that the challenged laws and policies make it "far more likely" that the school "will be unable to obtain funding for the upcoming school year and/or future school years."  Compl. ¶ 14.  If and when that occurs, the plaintiffs allege, Curtis Morley will have no choice but to attend a low-performing traditional public school.

## II.   LEGAL STANDARDS

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"  Mytych v. May Dept. Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)).

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if

the court 'lacks the statutory or constitutional power to adjudicate it[.]'" Cortlandt St. Recovery Corp. v. Hellas Telecomm., 790 F.3d 411, 416-17 (2d. Cir. 2015) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). The party asserting subject matter jurisdiction "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).

When reviewing a motion to dismiss for lack of subject matter jurisdiction, the court must accept as true all material factual allegations in the complaint.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  However, the court is "not to draw inferences from the complaint favorable to the plaintiffs." J.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). Rather, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citing Norton v. Larney, 266 U.S. 511, 515 (1925)).

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff.  Scheuer

v. Rhodes, 416 U.S. 232, 236 (1974).  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 557 (citations omitted).  However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

## III. DISCUSSION

The six claims in the complaint are as follows: Claim One, a claim that the defendants have violated the plaintiffs' fundamental right to substantial equality of educational opportunity under the Fourteenth Amendment's Equal Protection Clause; Claim Two, a claim that the defendants have violated the Fourteenth Amendment's Equal Protection Clause because they knowingly deprived the plaintiffs of their fundamental right to a minimally adequate education; Claim Three, a claim that the defendants have violated the plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause by forcing students to attend public schools that it knows are failing, while impeding the availability of educational alternatives; Claim Four, a claim that the defendants have violated the Fourteenth Amendment's Due Process Clause because they knowingly deprive the plaintiffs of their fundamental right to a minimally adequate education; Claim Five, a claim that the defendants have violated the Fourteenth Amendment's Due Process Clause on its face and as applied to the plaintiffs, because they knowingly infringed on the plaintiffs fundamental liberty and punish the student-plaintiff's for something beyond their control; Claim Six, a claim that the defendants have violated the Fourteenth Amendment's Due Process and Equal Protection Clauses because Connecticut is failing to fulfill its duty of public

administration; and Claim Seven, a claim that the defendants have violated 42 U.S.C. § 1983 by depriving the plaintiffs of numerous rights secured by the Fourteenth Amendment.

The defendants argue that the plaintiffs lack standing and also that their claims are barred by the Eleventh Amendment. The court finds each of these arguments unpersuasive. The defendants also argue that the plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. The court finds that argument persuasive except with respect to Claim Six, as to which the defendants do not provide any argument in their memorandum of law.

### A. Standing

Federal courts are courts of limited jurisdiction, with the power to hear only cases and controversies within the scope of Article III of the United States Constitution. Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). A case or controversy within constitutional limits, "redress[es] or prevent[s] actual or imminently threatened injury to persons caused by private or official violation of law." Summers v. Earth Island, 555 U.S. 488, 492 (2009). The

> irreducible constitutional minimum of standing contains three
> elements. First, the plaintiff must have suffered an 'injury
> in fact' . . . . Second, there must be a causal connection
> between the injury and the conduct complained of . . . .
> Third, it must be likely, as opposed to merely speculative,
> that the injury will be redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)

(internal citations omitted).

"The party invoking federal jurisdiction bears the burden of establishing" that they have standing.  Lujan, 504 U.S. at 561.  At the pleading stage, "standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'"  FW/PBS, Inc. v. City of Dallas, 439 U.S. 215, 232 (1990) (first quoting Grace v. Am. Cent. Ins. Co., 109 U.S. 278, 284 (1883) and then quoting Mansfield C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). "General factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561 (quoting Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 889 (1990)) (alteration in original).

On a 12(b)(1) motion to dismiss, where, as here, the defendants do not proffer evidence beyond the pleadings, "the task of the district court is to determine whether the Pleading 'allege[s] facts that affirmatively and plausibly suggest that

[the plaintiff] has standing to sue.'" Carter v. HealthPort
Tech., LLC, 822 F.3d 47, 56 (2d Cir. 2016) (quoting Amidax
Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir.
2011)).

### 1. Injury-in-fact

To show an injury-in-fact, the plaintiffs must have
suffered "an invasion of a legally protected interest which is
(a) concrete and particularized and (b) actual or imminent, not
conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal
citations and quotation marks omitted). Each of the plaintiffs'
claims rest on the same injury caused by a different violation
of law. "Connecticut has compelled [plaintiffs] and thousands
more students to attend schools it knows are chronically
failing. . . . The State's conduct undeniably has deprived
plaintiffs and countless others of the opportunities available
to their peers." Pl.'s Mem. Law in Opp. Def.'s Mot. to Dismiss,
ECF No. 30 ("Pl.'s Mem.") at 8. This loss of opportunity to
receive an adequate and equal education and the attendant
consequences of the lost opportunity are sufficient injury for
the plaintiffs' standing.

"[S]tanding in no way depends on the merits of the
plaintiff's contention that particular conduct is illegal."
Warth v. Seldin, 422 U.S. 490, 500 (1975). A court must assume

16

that for the purposes of standing, the claimed state action
"would be adjudged violative of the constitutional and statutory
rights of the persons excluded." Id. at 502. To assume otherwise
"would put the merits cart before the standing horse."
Initiative and Referendum Institute v. Walker, 450 F.3d 1082,
1093 (10th Cir. 2006). Nevertheless, the standing inquiry "often
turns on the nature and source of the claim asserted." Warth,
422 U.S. at 500.

In cases claiming a violation of the Equal Protection
Clause of the Fourteenth Amendment, a plaintiff has standing
"[w]hen the government erects a barrier that makes it more
difficult for members of one group to obtain a benefit than it
is for members of another group . . . ." Ne. Fla. Chapter of
Associated Gen. Contractors of Am. v. City of Jacksonville,
Fla., 508 U.S. 656, 666 (1993). The injury is "the denial of
equal treatment resulting from the imposition of the barrier,
not the ultimate inability to obtain the benefit." Id. In this
situation, the plaintiff "need not allege that he would have
obtained the benefit but for the barrier in order to establish
standing." Id. Instead, she need only demonstrate an intent,
or that she is "able and ready," to pursue the benefit.

The plaintiffs claim they, and many other Connecticut
residents are "confined to severely underperforming schools—

17

schools that . . . simply do not provide students with the
necessary tools to succeed academically or to become productive
and successful members of society." Compl. ¶ 30. "The State's
conduct undeniably has deprived plaintiffs and countless others
of the opportunities available to their peers." Pl.'s Mem., at
8. The plaintiffs "have no choice but to receive an education
that is substantially unequal and completely inadequate. . . ."
Compl. ¶ 30. Connecticut's Anti-Opportunity Laws, which the
plaintiffs allege violate the Equal Protection and Due Process
Clauses of the Fourteenth Amendment, caused the plaintiffs to
suffer a lost opportunity of attaining an adequate and equal
education and the attendant consequences of the lost
opportunity.

The defendants argue that "the only injury plaintiffs
complain of is the State's alleged failure to provide plaintiffs
with adequate educational opportunities." Def.'s Mem. Law Supp.
Mot. Dismiss, ECF No. 26-1 ("Def.'s Mem.") at 9. They also argue
that the plaintiffs have not alleged any facts to demonstrate
that they personally have been deprived of any educational
opportunities. These arguments are unpersuasive. The plaintiffs'
claimed injury is not simply lack of adequate educational
opportunities in a vacuum, but the many consequences that come
with attending a failing school, including graduation degrees
viewed as meaningless and, risk of below-median incomes, and

difficulty in achieving post-secondary school success. The plaintiffs do not rely solely on educational outputs in terms of test scores to define their injury, but also on the impact of attending failing schools.

The defendants argue that Montesa v. Schwartz, is dispositive on the issue of standing in this case. 836 F.3d 176 (2d Cir. 2016). In Montesa, the plaintiffs sued the school district and other defendants alleging that the defendants promoted the Hassidic Jewish faith in violation of the Establishment Clause of the First Amendment. The defendants argued that the plaintiffs lacked standing. The court observed that "[o]ur jurisprudence has developed three distinct theories of standing entitling an individual to pursue a claim that the Establishment Clause has been violated: (1) taxpayer, (2) direct harm, and (3) denial of benefits." Id. at 195. In Montesa, the plaintiffs' sole argument was that they "have standing under a direct exposure theory to assert that the Defendants violated the Establishment Clause and directly injured them." Id. at 196. The court concluded, however, that

> [t]he Student-Plaintiffs lacked standing because they do
> not allege that their injuries were caused by a personal
> exposure to and confrontation with the object of the
> governmental action they challenge . . . as described
> above, the Student-Plaintiffs allege that they were
> deprived of educational services because public funds,
> which otherwise would have been available to them, were
> diverted to an unconstitutional purpose. Contrary to their

assertion the Student-Plaintiffs have not been directly
effected . . . .

Id. at 198-99.

It was in this context that the court included in the
opinion, in a footnote rebutting a point made in the dissent,
the language on which the defendants rely here. The court finds
the defendants' arguments unpersuasive because here, not only
are the plaintiffs not pursuing a claim that the Establishment
Clause has been violated, but also they have alleged facts that
establish that the defendants caused the plaintiffs to suffer a
lost opportunity of attaining an adequate and equal education
and the attendant consequences of the lost opportunity. To
interpret Montesa as the defendants urge the court to do would
be to "put the merits cart before the standing horse." Walker,
450 F.3d at 1093.

For purposes of the injury-in-fact portion of the standing
analysis, "[w]e must assume, taking the allegations in the
complaint as true" that the Anti-Opportunity Laws have had the
effect of ensuring "some children have no choice but to receive
an education that is substantially unequal and completely
inadequate" and that such practices "if proved in a proper case,
would be adjudged violative of the constitutional . . . rights
of the persons excluded." Warth, 422 U.S. at 502. However, the,

plaintiffs "must allege and show that they personally have been injured, not that the injury has been suffered by other, identified members of the class to which they belong. . . ." Id.

The plaintiffs allege that they are either attending a chronically failing district school or that they are at imminent risk of being forced to attend chronically failing district schools in the near future. All the plaintiffs have consistently applied for alternative education opportunities but due to the Anti-Opportunity Laws have been excluded from public charter, magnet, and Open Choice Schools.

### 2. Causation

"The traceability requirement for Article III standing means that 'the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury.'" Chevron Corp. v. Donziger, 833 F.3d 74, 121 (2d Cir. 2016) (internal quotations omitted). This requirement focuses on whether the injury was " fairly attributable to the challenged ordinance[s] instead of to other factors." Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 44 (1976). The plaintiffs need not show that the State's actions were the proximate cause of the injury. Rothstein v. UBS AG, 708 F.3d 82, 91-92 (2d. Cir. 2013). "[W]hile the indirectness of an injury may make it substantially more difficult to show the fairly traceable element of Article

III standing, i.e., to establish that, in fact, the asserted
injury was the consequence of the defendant's actions,
indirectness is not necessarily fatal to standing." Id. at 91
(internal quotations omitted). The plaintiffs' alleged injury is
sufficiently traceable to the Anti-Opportunity Laws.

The defendants argue that there is no factual basis in the
Complaint to conclude that any purported failure in the
plaintiffs' own academic achievement is the result of any act or
omission by the State. This argument rests on a faulty premise
that the plaintiffs' injuries are the micro-level inputs in
their classroom rather than the lost opportunity for an adequate
and equal education and the attendant consequences of that loss.

The defendants also argue that the plaintiffs' injuries are
not traceable to the Anti-Opportunity Laws because those laws
govern educational vehicles that are wholly separate and apart
from the traditional public schools the plaintiffs' attend. But
the plaintiffs' injuries are fairly traceable to the Anti-
Opportunity Laws because the plaintiffs allege that the State's
decision to restrict enrollment in magnet, charter, and Open-
Choice schools diminishes the plaintiffs' chances of escaping
failing schools. Being in those failing schools is the direct
cause of their injury, and the laws at issue deprive them of the
opportunity to attend a school that is not failing.

22

### 3. Redressability

To satisfy the redressability prong of Article III standing, the plaintiffs must demonstrate that they "personally would benefit in a tangible way from the court's intervention." Warth, 422 U.S. at 508. "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (internal quotations omitted). The plaintiffs meet the redressability standard here.

The plaintiffs request that the court hold the Anti-Opportunity Laws unconstitutional. The defendants argue that if the statutes are declared unconstitutional, the only result will be a statutory void that the General Assembly may or may not fill in a manner that may or may not provide the benefits that the plaintiffs seek. Because there would be such a void, the defendants argue, it cannot be likely that the plaintiffs will have access to adequate and equal education and no longer suffer the attendant consequences of their current lost opportunity. But an "aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing." Adardand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995).

Here, a declaration invalidating and enjoining the Anti-Opportunity Laws would benefit the plaintiffs by removing State-sanctioned barriers. The plaintiffs' chances of winning a magnet

school lottery may increase with more magnet schools. That is sufficient for purposes of redressability. See Bryant v. New York State Educ. Dept., 692 F.3d 202, 211 (redressability requirement satisfied where "if Plaintiffs prevail, children may be able to receive other aversives at JRC"). Similarly, striking down the State's current Open Choice and charter school regulations will remove legal constraints that disincentivize Open Choice and create uncertainty for charter schools. Without the uncertainty, "charter school operators such as KIPP and Uncommon Schools undoubtedly would open a network of charter schools in Connecticut, thereby giving thousands of Connecticut's inner-city students an opportunity to escape the failing schools that the State compels them to attend." Compl. ¶ 96; see also, Bryant, 692 F.3d. at 211 ("If New York's prohibition was declared invalid, it is "likely" that other facilities in New York would provide aversives.").

It is true that the plaintiffs do "not know what exactly [the State] would do to comply with a ruling invalidating [these laws]," but the defendants "cannot say that the probability of [] a mode of compliance is so slight that the plaintiffs cannot show that they have anything to gain from winning their suit and so cannot be permitted to maintain it." Weismueller v. Kosobucki, 571 F.3d 699 (7th Cir. 2009). Invalidating the Anti-

Opportunity Laws creates a likelihood that the plaintiffs could receive an adequate and equal education.

### 4. Curtis Moorley

The fact that plaintiff Curtis Moorley has been granted admission to one of the charter schools that the plaintiffs seek to attend does not result in him losing standing. He continues to have standing to seek relief against future injury that may result from the Anti-Opportunity Laws' control over charter school education. See Parents Involved in Cmty. Schs. v. Seattle Sch. District, 551 U.S. 701, 719 (2007) (finding standing for plaintiff who had granted a transfer because "upon his enrollment in . . . school, he may again be subject to assignment based on his race").

### B. The Eleventh Amendment

The Eleventh Amendment precludes suit against the State and its officers unless: (1) the State unequivocally consents to suit in federal court; (2) Congress unequivocally abrogates the State's immunity; or (3) the case falls within the Ex parte Young exception. See Green v. Mansour, 474 U.S. 64, 68 (1985). The plaintiff's claims fit within the long-standing exception to sovereign immunity recognized in Ex parte Young, 209 U.S. 123 (1908). Under Ex parte Young, the State's immunity may be avoided when the suit seeks prospective relief against state

officials for ongoing violations of law. It is "a landmark of American constitutional jurisprudence that operates to end ongoing violations of federal law and vindicate the overriding federal interest in assuring the supremacy of that law." In re Deposit Ins. Agency, 482 F.3d 612, 618 (2d Cir. 2007).

"In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Maryland, Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997) (O'Conner, J., concurring). If so, the Eleventh Amendment does not bar the suit in question.

Here, the plaintiffs satisfy both prongs. First, the plaintiffs allege that the defendants are violating the federal Constitution by depriving the plaintiffs of an adequate and equal education as compared to their peers. Second, the plaintiffs are requesting only declaratory and injunctive relief to prevent future constitutional violations. Because the plaintiffs have satisfied this "straightforward" inquiry, the plaintiffs' claims may proceed under the Ex parte Young exception to the Eleventh Amendment.

The defendants argue that this case is exempt from the Ex parte Young exception because the suit seeks relief that diminishes the State's "special sovereignty interests." Coeur d'Alene, 521 U.S. at 281. "[T]he question posed by Coeur d'Alene is . . . whether the relief requested would be so much of a divestiture of the state's sovereignty as to render the suit as one against the state itself. To interpret Coeur d'Alene differently would be to open a Pandora's Box as to relative importance of various state powers or areas of state regulatory authority." Agua Caliente Band of Cahuilla Indians v. Hardin, 223 F.3d 1041, 1048 (9th Cir. 2000); Vann v. Kempthorne, 534 F.3d 741, 756 (D.C. Cir. 2008) ("[W]e cannot extend Coeur d'Alene beyond its 'particular and special circumstances' . . . which involved the protection of a State's land.") (internal citation omitted); Hill v. Kemp, 478 F.3d 1236, 1259 (10th Cir. 2007) (holding Coeur d'Alene does not require "federal courts [to] examine whether the relief sought against a state official implicates special sovereignty interests") (internal quotations omitted). "We leave it to the Supreme Court to decide whether to add additional sovereign interests to the core concerns discussed in Coeur d'Alene." Vann, 534 F.3d at 756.

The defendants argue that education has been recognized by the Supreme Court as an important interest and attempt to distinguish the Supreme Court's decisions that permit education

cases to proceed under <u>Ex parte Young</u> from the case before us. The defendants assert that the plaintiffs ask the court to dictate the specific remedy the State must use by requiring it to fund unlimited charter schools, magnet schools, and Open Choice opportunities for any student who wants them. That is not so. The plaintiffs seek only traditional remedies: a declaration that the laws violate the Constitution, an injunction against further enforcement, and an injunction requiring the State to take any and all steps necessary to remedy constitutional violations. As <u>Milliken v. Bradley</u>, 433 U.S. 267 (1977), <u>Papasan v. Allain</u>, 478 U.S. 265 (1986), and many other education-related cases make clear, challenges to education laws and practices are permissible if they satisfy <u>Ex parte Young</u>.

Lastly, the defendants argue that <u>Ex parte Young</u> should not apply because relief in this case will interfere with a recent state court judgment. The defendants do not cite any precedent for the proposition that a federal court can rely on parallel state litigation to find that a case is exempt from the <u>Ex parte Young</u> exception.

### C. 12(b)(6) Failure to State a Claim

#### 1. Claim One: No Fundamental Right to Substantial Equality of Educational Opportunity

The Equal Protection Clause "does not forbid classifications," it "simply keeps governmental decisionmakers

from treating differently persons who are in all relevant
respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). As a
threshold matter, the defendants argue that the plaintiffs
cannot state an equal protection claim because all students have
the same ability to seek admission to a charter or magnet school
and to participate in the Open Choice program. However, the
plaintiffs allege that the Anti-Opportunity Laws treat students
in failing traditional public schools far worse than students
who are fortunate enough to attend satisfactory or superior
traditional public schools. They allege that only students in
failing traditional schools require educational alternatives and
therefore, only those students are harmed by the Anti-
Opportunity Laws.

In Claim One, the plaintiffs claim that the Anti-
Opportunity Laws violate their fundamental right to substantial
equality of educational opportunity under the Equal Protection
Clause of the Fourteenth Amendment. But there is no such
fundamental right.

In San Antonio Independent School Dist. v. Rodriguez, the
Supreme Court held that education is not a fundamental right
under the Federal Constitution. 411 U.S. 1, 37 (1973). The
plaintiffs argue that they are not asking the court to overrule
Rodriguez, merely to apply modern constitutional jurisprudence

to the facts of this case in light of the sea change that has taken place over the past four decades. But the court cannot grant the plaintiffs the relief they seek without being inconsistent with Rodriguez. See Plyler v. Doe, 457 U.S. 202, 221, 223 (1982) ("Public education is not a 'right' granted to individuals by the Constitution." (citing Rodriguez, 411 U.S. at 35)). Regardless of subsequent decisions of the Supreme Court in other contexts, it has not overruled Rodriguez.

The plaintiffs point to Windsor v. United States, where the Second Circuit found that Supreme Court precedent was not controlling and argue that the court is not bound by Rodriguez. 699 F.3d 169m 178-79 (2d Cir. 2012). However, the precedent at issue in Windsor was a summary dismissal for want of a substantial federal question and the precedential value of such dismissals is limited to the precise issues presented. Because the issue presented in Windsor was different from that in the prior Supreme Court case, the Second Circuit held that the precedent did not apply. Thus, the Second Circuit did not overturn or disregard Supreme Court precedent.

Because there is no fundamental right to substantial equality of educational opportunity under the Equal Protection Clause, Claim One is dismissed.

### 2. Claims Two and Four: No Fundamental Right to a Minimally Adequate Education

In Claims Two and Four, the plaintiffs claim that the Anti-Opportunity Laws violate their fundamental right to a minimally adequate education under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Neither clause provides for such a fundamental right.

In Rodriguez, the Supreme Court did not leave the door open for federal courts to recognize a fundamental right to a minimally adequate education. To the contrary, the Court rejected the idea of a fundamental right to education, without parsing how effective or adequate the education might be, because such a right is not guaranteed in the Constitution. See Rodriguez, 411 U.S. at 37. Moreover, in Plyler, the Court cited Rodriguez's holding for that proposition. Plyler, 457 U.S. at 221.

The plaintiffs argue that Rodriguez left open the possibility of a constitutional violation where "the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." 411 U.S. at 37. However, the language relied on by the plaintiffs appears in the following context:

31

> Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where--as is true in the present case--no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

Rodriguez, 411 U.S. at 37.

Because there is no fundamental right to a minimally adequate education under the Equal Protection Clause or the Due Process Clause, Claim Two and Claim Four are dismissed.

### 3. Claim Three: Rational Basis Scrutiny Applies

In Claim Three, the plaintiffs claim that the Anti-Opportunity Laws violate their equality interest as protected by the Equal Protection Clause of the Fourteenth Amendment. The plaintiffs contend that the heightened scrutiny standard applied by the Supreme Court in Plyler v. Doe applies here because the Anti-Opportunity Laws present unreasonable obstacles to advancement on the basis of merit. Plyer's heightened scrutiny standard does not apply in this case.

The plaintiffs claim that the Anti-Opportunity Laws trigger heightened scrutiny because, irrespective of whether education is a fundamental right, they deprive certain students of an equal opportunity to access the quality education available to

other students in the State. The Anti-Opportunity Laws "treat
students in failing traditional public schools . . . far worse
than students who are fortunate enough to attend satisfactory or
superior traditional public schools." Pls.' Mem., at 26.
Students in failing traditional public schools rely on
educational alternatives for an adequate education; therefore,
the plaintiffs argue, only those students are harmed by the
Anti-Opportunity Laws that restrict the public alternatives.

The plaintiffs argue that under Plyler, "any law impairing
a child's ability to receive an equal or adequate educational
opportunity" is subject to heightened scrutiny if the burdens
fall on poor students who cannot control where they live. The
Court's rationale for using intermediate scrutiny in Plyler does
not apply here. In Plyler, the State of Texas deliberately
targeted and discriminated against an entire class of
individuals, namely, children of undocumented immigrants, by
prohibiting every such child from attending the State's public
schools. The Court stated that "legislation directing the onus
of a parent's misconduct against his children does not comport
with fundamental conceptions of justice." 457 U.S. at 220. Given
the importance of public education, the State's complete
deprivation of all educational opportunities, and the equal
protection concerns raised by the State's deliberate
discrimination against an entire class of children, the Court

33

determined that intermediate scrutiny was appropriate in the unique circumstances of that case. The Supreme Court and the Second Circuit have both found that Plyer cannot be extended "beyond the "unique circumstances that provoked its unique confluence of theories and rationales." Kadrmas v. Dickenson Public Schools, 487 U.S. 450, 459 (1988) (internal citations omitted); see also Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs, 962 F.2d 136, 142 (2d Cir. 1992).

The plaintiffs discuss three cases they say support their position that heightened scrutiny is appropriate here. However, these cases are all within the parameters of Plyler. In Lewis v. Thompson, 252 F.3d 567 (2d Cir. 2001) the plaintiffs "contend[ed] that the heightened scrutiny applied in Plyler is appropriate here because the discriminatory denial of automatic eligibility, although not based on race, is imposed on the citizen children solely because of the unqualified alien status of their mothers." Id. at 591. As part of its analysis the court stated:

> Although the Supreme Court has noted that it has not extended Plyler beyond its 'unique circumstances' the Court has identified those circumstances as (a) penalizing children for the illegal conduct of their parents and (b) risking significant and enduring adverse consequences to the children.

Id. (internal citations omitted) (emphasis added). Hispanic Interest Coal. of Ala. v. Governor of Alabama, 691 F.3d 1236

(11th Cir. 2012) involved a statute that "require[d] every public elementary school and secondary school within Alabama to determine upon enrollment whether the enrolling child 'was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States." Id. at 1244. In discussing Plyler, the court stated:

> In finding an equal protection violation, the Court
> emphasized the blamelessness of the children who were
> subject to the burden and underscored the importance of
> providing education free of 'unreasonable obstacles to
> advancement on the basis of individual merit.'

Id. at 1245-46 (internal citations omitted). In Nat'l Law Ctr. on Homelessness and Poverty, R.I. v. New York, 224 F.R.D. 314 (E.D.N.Y. 2004), the plaintiffs claimed "that homeless children in Suffolk County are not receiving the same access to public school education enjoyed by nonhomeless children." Id. at 321. In discussing Plyler, the court stated:

> Since Plyler, the Supreme Court has declined to extend
> heightened scrutiny in regard to education beyond the
> unique circumstances of Plyler. However, the Supreme Court
> implied that statutes which create circumstances that
> involve the penalization of children for the 'illegal
> conduct of their parents' and risk significant and enduring
> adverse consequences to children should be reviewed using
> the Plyler rationales.

Id. at 321-22 (internal citations omitted).

Here, the Anti-Opportunity Laws apply equally to all students. The State has not deliberately targeted the plaintiffs. Nor has the State denied the plaintiffs all

educational opportunities. Thus, rational basis review is used
for Claim Three.

"[L]egislative acts that do not interfere with fundamental
rights or single out suspect classifications carry with them a
strong presumption of constitutionality and must be upheld if
rationally related to a legitimate state interest." Beatie v.
City of New York, 123 F.3d 707, 711 (2d Cir. 1997). In order to
survive a Rule 12(b)(6) motion to dismiss

> a plaintiff must allege facts sufficient to overcome the
> presumption of rationality that applies to government
> classifications. When neither the complaint nor the non-
> moving party's opposition negate any reasonably conceivable
> state of facts that could provide a rational basis for the
> challenged classification, a defendant's motion to dismiss
> an equal protection claim will be granted.

Vizio Inc. v. Klee, No. 3:15-cv-00929(VAB), 2016 WL 1305116, at
*22 (D. Conn. Mar. 31, 2016) (quoting Immaculate Heart Cent.
Sch. v. New York State Pub. High Sch. Athletic Ass'n, 797 F.
Supp. 2d 204, 211 (N.D.N.Y. 2011).

Under rational basis scrutiny, laws are "accorded a strong
presumption of validity" and must be upheld "if there is any
reasonably conceivable state of facts that could provide a
rational basis" for the law. Heller v. Doe, 509 U.S. 312, 319-20
(1993). Courts may not "strike down a law as irrational simply
because it may not succeed in bringing about the result it seeks
to accomplish [or] because the problem could have been better

addressed in some other way." Beatie, 123 F.3d at 712 (internal citations omitted). When it does not violate a fundamental right or target a suspect class, the manner in which a State chooses to provide public education may not be disturbed because there are "other methods of satisfying the State's interest." Rodriguez, 411 U.S. at 51.

Here, as the defendants assert, "the legislature could rationally believe that the best and most effectivfe way to address [shortcomings in some traditional public schools] is to take steps to improve the education opportunities provided in those schools, as opposed to creating and funding an entirely new and more expensive system of charter and magnet[] schools." Def's Mem. at 35 (emphasis in original). The fact that the State has elected to implement limited magnet school, charter school, and Open Choice programs does not mean that its decision not to expand those programs is irrational. "[A] statute is not invalid under the Constitution because it might have gone further than it did." Rodriguez, 411 U.S. at 39. "[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Id.

Because the State's policy choice survives rational basis review, Claim Three is dismissed.

### 4. Claim Five: No Deprivation of a Liberty Interest

In Claim Five, the plaintiffs claim that the Anti-Opportunity Laws violate students' liberty by doling out educational opportunities in a manner that punishes children for something beyond their control. There is no such punishment at issue in this case.

The plaintiffs rely on <u>St. Ann v. Palasi</u>, 495 F.2d 423 (5th Cir. 1974) but that case is inapposite. At issue there was a school board regulation which allowed children to be suspended for the parents' misconduct. The court concluded that there is a liberty interest in the right to have punishment be predicated only upon personal guilt, and not upon guilt by association with the acts of another. <u>See</u> <u>id.</u> at 425-26. Here, the plaintiffs are not being punished for the misconduct of their parents.

Because the Anti-Opportunity Laws do not violate the liberty protections of the Due Process Clause, Claim Five is dismissed.

### 5. Claim Six: Duty of Public Administration

Although the defendants move to dismiss all of the claims in the Complaint, they make no argument with respect to Claim Six in their memorandum in support of their motion to dismiss. Therefore the motion is being denied as to Claim Six, but with leave to file a supplemental motion to dismiss.

### 6. Claim Seven: 42 U.S.C. § 1983

The plaintiffs fail to respond to the defendants' arguments as to why Claim Seven should be dismissed. Therefore that claim is being deemed abandoned and is dismissed. See McLeod v. Verizon New York, 995 F. Supp. 2d 134 (E.D.N.Y. 2014) ("[C]ourts in this circuit have held that '[a] plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitute an abandonment of those claims.'") (internal citation omitted); Conforti v. Sunbelt Rentals, Inc., 201 F. Supp. 3d 278, 291-92 (finding that where the plaintiff did not address defendant's arguments, the plaintiff's claims were "abandoned");

## II. CONCLUSION

For the reasons set forth above the Defendant's Motion to Dismiss (Doc. No. 26) is hereby GRANTED in part. Claims One, Two, Three, Four, Five, and Seven are hereby dismissed, and the defendants are granted leave to file, within 30 days, a supplemental motion to dismiss with respect to Claim Six.

It is so ordered.

Signed this 28th day of September, 2018, at Hartford, Connecticut.

                        /s/ AWT
            _____
            Alvin W. Thompson
            United States District Judge